1  COOLEY LLP
   ALI M. M. MOJDEHI (123846)
2  (AMOJDEHI@COOLEY.COM)
   JANET DEAN GERTZ (231172)
3  (JGERTZ@COOLEY.COM)
   ALLISON M. REGO (272840)
4  (AREGO@COOLEY.COM)
   4401 Eastgate Mall
5  San Diego, CA  92121
   Telephone:   (858) 550-6000
6  Facsimile:    (858) 550-6420

7  Attorneys for Plaintiff
   Immigration Judge A. Ashley Tabaddor
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  AFSANEH ASHLEY TABADDOR,              Case No.  14-cv-06309

13             Plaintiff,

14        v.

15  ERIC H. HOLDER, JR., Attorney          **AMENDED COMPLAINT**
    General of the United States, United
16  States Department of Justice;
    JEFFREY A. ROSENBLUM, General
17  Counsel, Executive Office for          **DEMAND FOR JURY TRIAL**
    Immigration Review; THOMAS Y.K.
18  FONG, Assistant Chief Immigration
    Judge, Executive Office for
19  Immigration Review; MARLENE M.
    WAHOWIAK, Associate General
20  Counsel, Office of the General
    Counsel, Executive Office for
21  Immigration Review; UNITED
    STATES DEPARTMENT OF
22  JUSTICE; EXECUTIVE OFFICE FOR
    IMMIGRATION REVIEW, UNITED
23  STATES DEPARTMENT OF
    JUSTICE; OFFICE OF THE
24  GENERAL COUNSEL, EXECUTIVE
    OFFICE FOR IMMIGRATION
25  REVIEW; OFFICE OF THE CHIEF
    IMMIGRATION JUDGE,
26  EXECUTIVE OFFICE FOR
    IMMIGRATION REVIEW,
27
             Defendants.
28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

110492886 v8

Afsaneh Ashley Tabaddor ("Plaintiff" or "Judge Tabaddor"), for her Complaint alleges as follows:

## I.   INTRODUCTION

1. Judge Tabaddor is a sitting Immigration Judge with the United States Department of Justice ("DOJ" or "Justice Department"), Executive Office for Immigration Review ("EOIR").[1] Judge Tabaddor is also a highly respected member of the Iranian-American community. In 2012, EOIR ordered that Judge Tabaddor be recused from any and all cases before her involving Iranian nationals and that she should not be assigned any such cases in the future—an order that remains in effect today. As detailed below, Judge Tabaddor challenges the propriety and constitutionality of a blanket recusal and reassignment order, of indefinite duration, where the precipitating factor for the Agency action was Judge Tabaddor's exercise of her First Amendment rights—*outside* the workplace, on her *own time*, and in her *personal* capacity—associated with the Iranian-American community.

2. It is axiomatic that a judge does not check her First Amendment rights at the courthouse door, to be reclaimed at the expiration of her judicial tenure. Quite the opposite, Judges routinely speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, the administration of justice and a range of other matters of public concern. Immigration Judges are no exception. Indeed, Immigration Judges (as well other Justice Department employees) in general, are affirmatively *encouraged* by the Justice Department's written policy to be role models and leaders in the community by speaking, writing, lecturing, teaching and participating in outside volunteer and professional activities, including pro bono and bar activities. But, in the case of Immigration Judges, the Justice Department has debased these lofty public service ideals by making an Immigration

---

[1] As used herein "Agency" means all of the above-named Defendants singularly, collectively or in any combination.

1   Judge's participation in pro bono and civic activities grounds for adverse treatment
2   and interference with the Immigration Judge's decision making authority in the
3   cases before her.

4       3.  Both prior to her appointment and during Judge Tabaddor's nearly nine years
5   of service as an Immigration Judge, she has embraced the very community service
6   activities supported by Justice Department policy, actively engaging in a variety of
7   community, educational, civic, bar and pro bono activities. In the summer of 2012,
8   Judge Tabaddor was invited to attend an event held by the White House Office of
9   Public Engagement entitled a "Roundtable with Iranian-American Community
10  Leaders." Judge Tabaddor sought approval for use of one day of annual leave to
11  attend the event. Although her request was ultimately approved, at the same time,
12  Defendant Rosenblum recommended that Judge Tabaddor recuse herself from all
13  cases involving Iranian nationals, stating that Judge Tabaddor's association with the
14  Iranian-American community and invitation to the attend the Roundtable event
15  created an appearance of impropriety requiring recusing under 5 C.F.R. §
16  2635.502(a). After Judge Tabaddor protested the recommendation, among other
17  things, the recommendation was elevated to an order, implemented by Defendant
18  Fong.

19      4.  This Complaint seeks to remedy the lawless and discriminatory action on the
20  part of the Justice Department, taken against Judge Tabaddor, who has been
21  adversely treated, simply because of her race and/or national origin and her exercise
22  of her First Amendment rights to participate in outside volunteer and professional
23  activities in connection with the Iranian-American community. Unless the Agency
24  is prevented from having unbridled power to issue recusal orders against
25  Immigration Judges, based on their race, national origin, religion or perceived
26  interests, the effect is that Immigration Judges will be improperly manipulated and
27  intimidated by Justice Department officials, and their decisional independence will
28  be severely threatened. Likewise, the Agency's adoption of a policy of requiring

blanket recusals based upon protected speech and associational activities of Immigration Judges outside of the workplace has a chilling effect, depriving not only Judge Tabaddor, but all Immigration Judges of their First Amendment rights of free expression and assembly outside the workplace.

5.   The blanket recusal order not only required Judge Tabaddor to recuse herself from all cases involving Iranian nationals that were before her at the time the Agency gave its mandate, but it also remains  in effect to date thereby subjecting Judge Tabaddor to different case assignment standards than other Immigration Judges.  The heinous motivation behind the blanket recusal order is established by, among things, the paucity of meaningful good faith deliberations by the Agency and their failure to perform even the most elemental analysis or investigation.

6.   *First*, the order had no basis in law, and indeed was contrary to established law. In issuing the recusal order, the Agency expressly relied upon the Standards of Ethical Conduct for Employees of the Executive, Subpart E (5 C.F.R. Part 2635). Specifically, the Agency based its recusal order exclusively on 5 C.F.R. § 2635.502(a), which is inapposite to the facts at hand.[2] This regulation is applicable only to disqualification from a "particular matter" involving "specific parties,"—neither of which is present here. Instead, the blanket recusal and reassignment order applies broadly to *any* matter before the Immigration Court involving *any* person/respondent who is of Iranian nationality. There is no colorable excuse for the Agency's improper construction of 5 C.F.R. § 2635.502(a), where, among other

---

[2] 5 C.F.R. § 2635.502(a) provides:
> Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of the appearance problem and received authorization from the agency designee in accordance with paragraph (d) of this section.

things, the United States Office of Government Ethics ("OGE") has issued a Legal Advisory stating that the terms "particular matter" and "involving specific parties," in the regulation "are terms of art with established meanings" that reflect "a deliberate effort" to narrow the circumstances under which disqualification may apply. Thus, the OGE advised that a "case-by-case analysis is required to determine at what stage a particular matter has sufficiently progressed to involve specific parties." In other words, the Agency's reliance upon the above-cited regulation to support a blanket and perpetual recusal and reassignment order of the type imposed upon Judge Tabaddor, where the specific parties are not even known, is entirely implausible. Further to this point, as detailed below, the Office of the Chief Immigration Judge has issued an Operating Policies and Procedures Memorandum directing that recusal decisions be made on a case-by-case basis by the Immigration Judge himself or herself in the first instance. Moreover, this policy dictates that blanket recusals must be based, not upon a mere appearance of loss of impartiality, but upon actual bias, which is absent here. To be sure, in issuing the recusal order, the Agency expressly admitted that there was no claim or allegation of actual bias or impropriety.

7. By adopting an unsupportable (and indeed illegal) construction of the Standards of Ethical Conduct for Employees of the Executive, Subpart E (5 C.F.R. Part 2635), the Agency has improperly arrogated to itself the power to order a blanket recusal and the power to assign cases based on facially discriminatory criteria wholly divorced from ensuring the efficient disposition of cases before the Immigration Courts. Under the construction of 5 C.F.R. Part 2635 now being adopted by the Agency, once the EOIR arbitrarily determines that an Immigration Judge is identified as a "leader" or role model within a racial community (or similarly a religious community or community sharing a nationality), it may deem that there has been an "appearance of loss of impartiality"—not in connection with a particular case, but generally—as to *any matter* involving a person of that same

race, religion and/or national origin.  Then, the Agency may actively interfere with and manipulate the cases that are assigned to the Immigration Judge based upon, *inter alia*, the Immigration Judge's own race or national origin and/or the racial profile and national origin of the persons the Immigration Judge may have associated with in the course of her public service or pro bono activities. Such a policy is a gross perversion of the Standards of Ethical Conduct for Employees of the Executive Branch. Such a policy is also directly contrary to the will of Congress, and cannot be supported in the text of the statutes under which 5 C.F.R. Part 2635 was enacted.

8.  Additionally, as already touched upon, the Agency's order is also contrary to DOJ and EOIR policies affirmatively encouraging employees' engagement in outside civic and volunteer activities.  Judge Tabaddor has scrupulously adhered to Agency policies with respect to her speaking, educational and community activities outside of the workplace. Nonetheless, the Agency has subjected and continues to subject Judge Tabaddor to adverse treatment, and her reputation and integrity has been unjustly impugned, based upon those very outside activities, just because a portion of the volunteer and civic activities Judge Tabaddor engages in are associated with the Iranian-American community.

9. *Second*, the Agency expressly based the issuance of its order on discriminatory criteria. Specifically, it targeted Judge Tabaddor for recusal and reassignment of cases because of her race and national origin. Indeed, the Agency's order was issued in substantial reliance upon the quantity of results returned from a single internet search of Plaintiff's *misspelled* name and the word, "Iran." This is facially discriminatory and the epitome of a results-oriented approach, particularly where even this most minimal inquiry was undertaken only *after* the Agency had already recommended (though not ordered) Judge Tabaddor's recusal from cases before her and Judge Tabaddor had expressed her strong opposition to the recommendation. Also, in determining that Judge Tabaddor's activities raised an

appearance of impropriety, the Agency used improper discriminatory criteria, by pointing to the racial and national origin profile of the bar associations and community service and public interest groups Judge Tabaddor was identified with.

10. *Third*, the order violated internal Justice Department procedures for review and oversight of such a drastic action. The Agency decisionmakers failed to consult with numerous offices and individuals before issuing the recusal recommendation and order. Among other things, the EOIR's own Deputy Designated Agency Ethics Official at the time relevant to the Complaint, JuanCarlos Hunt ("Hunt"), was required to have been consulted prior to issuance of the order, but was not. Hunt later condemned the blanket recusal order as "inappropriate" and "discriminatory." The Agency's fundamentally flawed procedure for its investigation and analysis establishes the wrongfulness of the action and the Agency's discriminatory intent.

11. *Fourth*, the order chills First Amendment rights to participate in outside volunteer and professional activities, outside the workplace and completely apart from the role as an Immigration Judge or federal government employee. Here, for example, Defendant Rosenblum, EOIR's current General Counsel and one of the primary responsible officials for the Agency's unlawful action, threatened "consequences" for Judge Tabaddor's continued participation in outside volunteer and professional activities. The chilling impact is felt not only by Judge Tabaddor, but also affects other Immigration Judges, who have witnessed the adverse treatment to which Judge Tabaddor has been subjected.

12. Plaintiff herein alleges that the Agency has in the past and continues to unlawfully: (i) violate Plaintiff's First Amendment rights of free speech and association; (ii) discriminate against her on account of race, national origin, and/or religion and association with groups whose members are identified with these characteristics; and (iii) retaliate against her for having engaged in protected conduct. Plaintiff seeks a declaration that the recusal and reassignment order is unconstitutional and void.   Additionally, Plaintiff seeks a declaration that the

Agency's policy in the manner of application of 5 § C.F.R. 2635.502(a) is unconstitutional and requests the issuance of an injunction against its further enforcement in such a manner.

## II.    JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that this case arises under federal and constitutional law, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (referred to herein as "Title VII"), 5 U.S.C. app. § 404 and the First Amendment to the U.S. Constitution.

14. The Court has the authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3) because this action is brought against officers or employees of agencies or departments of the United States, in their official capacities, and departments and agencies of the United States, and because this is the judicial district where Judge Tabaddor resides and where a substantial part of the events or omissions giving rise to the claim occurred. Pursuant to 42 U.S.C. § 2000e-5(f)(3), each United State district court shall have jurisdiction of actions brought under Title VII.

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff has satisfied all of the procedural and administrative requirements set forth under Title VII with respect to the subject matter of this action. In particular:

    a.  On October 10, 2012, Plaintiff contacted an EEO counselor;

    b.  Plaintiff received a notice of final interview on or about November 19, 2012;

    c.  On November 29, 2012, Plaintiff filed an EEO complaint with the DOJ;

d. On or about May 20, 2014, Plaintiff received the DOJ's final agency decision and notice of right to sue; and

e. Plaintiff filed her complaint on August 12, 2014, within ninety (90) days of Plaintiff's receipt of the final agency decision and notice of right to sue. Plaintiff's discrimination and retaliation claims were raised in Plaintiff's EEO complaint or are like or reasonably related thereto, including as to new acts occurring during the pendency of Plaintiff's EEO complaint.

17. Plaintiff's claims under the First Amendment, which are solely for equitable relief and concern Plaintiff's free speech and associational activities apart from her employment by the Federal Government, do not require administrative exhaustion. Alternatively, Plaintiff's claims under the First Amendment should be excepted from any administrative exhaustion requirement because administrative exhaustion would be futile, Plaintiff would be irreparably injured in the absence of judicial review at this time, and administrative procedures and remedies are inadequate and inefficacious.

18. Plaintiff's claims seeking a declaration that the Agency's policy in the manner of application of 5 § C.F.R. 2635.502(a) is unconstitutional are appropriate for judicial review pursuant to 5 U.S.C. app. § 404, which provides that

> "[i]n promulgating rules and regulations pertaining to financial disclosure, conflict of interest, and ethics in the executive branch, the Director shall issue rules and regulations in accordance with chapter 5 of title 5, United States Code. *Any person may seek judicial review of any such rule or regulation*." (emphasis added).

## IV.   PARTIES

### A.   Judge Tabaddor

19. Judge Tabaddor was appointed as an Immigration Judge in 2005.  At all times relevant to the Complaint, Judge Tabaddor sat on the Immigration Court in Los Angeles, California.  Judge Tabaddor is qualified for her position.  Judge Tabaddor has at all times performed her duties as an Immigration Judge free from

bias and in a judicially impartial manner. Prior to being appointed as an Immigration Judge, Plaintiff served as an assistant United States attorney for the Central District of California.

20. Judge Tabaddor is a first-generation Iranian-American.  Her race is Near East Asian, Middle Eastern and Persian.  Judge Tabaddor is culturally Muslim.

### B.    Department of Justice

21. At all times relevant to the Complaint, Defendant Eric H. Holder was and is, as of the filing of the Complaint, the Attorney General of the DOJ and is sued in his official capacity. The DOJ is an executive department of the government of the United States.

22.  The EOIR was, at all times relevant to the Complaint, an agency within the DOJ, organized and existing under the laws of the United States. The Office of the Chief Immigration Judge is an office within the EOIR. The Chief Immigration Judge is responsible for providing overall program direction, articulating policies and procedures, and establishing priorities for Immigration Judges. The Chief Immigration Judge does not have authority to direct the result of an adjudication assigned to another Immigration Judge. The Office of the General Counsel ("OGC") is an office within the EOIR that is responsible for providing legal advice and assistance to the Director of the EOIR, the Deputy Director of the EOIR, and heads of the components within EOIR and supervising legal activities of the EOIR that are not related to the adjudication of immigration cases.

23. Jeffrey A. Rosenblum ("Rosenblum") was at all times relevant to the Complaint until December 2012, Chief Counsel of the Employee/Labor Relations Unit in the OGC and is sued in his official capacity. The Employee/Labor Relations Unit of OGC advises EOIR managers on personnel issues, defends Equal Employment Opportunity ("EEO") actions filed against the EOIR, monitors investigations conducted by the Office of Professional Responsibility in the DOJ,

and defends against unfair labor practices charges.  In December 2012, Rosenblum became General Counsel for the EOIR.

24. Marlene M. Wahowiak ("Wahowiak") was an Associate General Counsel at the DOJ's Office of Professional Responsibility.  From approximately March 2012 to December 2012, Wahowiak was on detail to the Employee/Labor Relations Unit in the OGC. In December 2012, Wahowiak became permanent at the Employee/Labor Relations Unit in the OGC. Wahowiak is sued in her official capacity.

25. Thomas Y.K. Fong ("ACIJ Fong") was, at all times relevant to the Complaint, an Assistant Chief Immigration Judge at the Immigration Court in Los Angeles, California and is sued in his official capacity.

26. At all times relevant to the Complaint, ACIJ Fong was Judge Tabaddor's direct supervisor.

## V.    STATEMENT OF FACTS

### A.    DOJ Policies Relating to Outside Activities

27. Since at least 2000, the DOJ has had a written policy that "Department employees are encouraged to participate in outside volunteer and professional activities, including pro bono and bar activities. . . ."  Even more, the Director of EOIR issued a memorandum recently reiterating, in the context of pro bono work, that the DOJ supports EOIR employees "who are already participating in community service and [encourages] those who have not yet made that step to do so."   In her nearly nine years on the bench, Judge Tabaddor has embraced the public service and community engagement ideals embodied by DOJ and EOIR policy.

28. As such, Judge Tabaddor regularly participates in a range of activities outside of the workplace in her personal capacity, including invitations to speak or otherwise participate in events organized by, among others, the Los Angeles County Bar Association, Coalition of Iranian Entrepreneurs, Kids in Need of

Defense, Public Affairs Alliance of Iranian Americans, Pacific Council on International Policy, Iranian American Women's Leadership Conference, Orange County Bar Association, Iranian American Bar Association, and academic institutions including her *alma matter* the University of California at Los Angeles ("UCLA"), and the University of California, Hastings School of Law.

29. With respect to all such outside activities, each of which has been taken in her personal capacity, Judge Tabaddor has scrupulously obtained the pre-approval of her supervisor, ACIJ Fong, as well as ethics pre-approval from the OGC. Such pre-approvals were obtained by Judge Tabaddor even when, because outside activities were undertaken in her personal capacity, such pre-approval was not strictly required by DOJ policy.

30. From the time of her appointment to the bench in and around November 2005 up to November 2012, Judge Tabaddor submitted for approval approximately 53 speaking engagement or teaching requests, substantially all of which were approved.  Of those, only in approximately 17 requests, or about 32%, did the name of the organization Judge Tabaddor was requesting to speak before have any connection with the Iranian-American community.

**B.     Judge Tabaddor Requests Leave to Attend Roundtable Event**

31. On June 27, 2012, Judge Tabaddor was invited by the White House Office of Public Engagement to attend an event entitled "Roundtable with Iranian-American Community Leaders." Judge Tabaddor planned to attend the meeting on her own time, purely in her personal capacity, and without any use of her official Justice Department title.  Although not generally required, when Judge Tabaddor requested permission from ACIJ Fong for annual leave, she explained that she was seeking personal annual leave to attend the Roundtable. ACIJ Fong initially indicated he was not inclined to approve the request and did not believe Judge Tabaddor should attend the event.  When Judge Tabaddor indicated that she did not agree with that assessment, and reminded ACIJ Fong that she was simply

requesting annual leave which is routinely granted without any need for explanation, ACIJ Fong stated that he was amenable to Judge Tabaddor putting the request in writing, to ACIJ Fong's attention, to be forwarded up, by Judge Tabaddor's understanding, to the Office of the Chief Immigration Judge.  Judge Tabaddor initiated such a written request. Without responding to Judge Tabaddor's written request, ACIJ Fong forwarded her request to the OGC.

32. Judge Tabaddor was then contacted by Rosenblum, on behalf of the OGC, who asked that they speak so he could pose some clarifying questions.  During the phone call, Rosenblum advised Judge Tabaddor that she could attend the Roundtable meeting as long as she was not appearing in her official capacity or representing anyone before a federal agency or official (*i.e.*, as such is delineated in 5 § C.F.R. 2635.801).  During the conversation, Rosenblum did not make any mention of recusal or any "consequences" of attending the Roundtable meeting.  Judge Tabaddor was attending purely in her personal capacity, outside of the workplace, and not "representing" any organization or individual at the Roundtable meeting, as such term is used in 5 C.F.R. § 2635.801.

33. On July 5, 2012, Judge Tabaddor received an email from Rosenblum in connection with her request to attend the Roundtable meeting.  As stated above, during this time, Rosenblum was not an Agency ethics officer, but rather was the Chief Counsel of the Employee/Labor Relations Unit. However, on information and belief, Rosenblum did act as a duty attorney for ethics issues during the time relevant to this Complaint. Rosenblum responded on behalf of the OGC and granted Judge Tabaddor approval to attend the Roundtable meeting in her personal capacity.  However, in the closing paragraph of his July 5, 2012 email, Rosenblum *sua sponte* "recommended" that Judge Tabaddor recuse herself from "any matter involving individuals from Iran that comes before [her] in [her] capacity as an Immigration Judge." Rosenblum stated this recommendation was made based on Judge Tabaddor's activities in the Iranian-American community, and her request to

participate in the Roundtable meeting. Without making any finding that any of Judge Tabaddor's prior activities had resulted in any appearance of impropriety, or that her attendance at the Roundtable meeting would result in such appearance of impropriety, Rosenblum stated: "Pursuant to 5 C.F.R. § 2635.502(a), an employee should not participate in a matter in which 'circumstances would cause a reasonable person with knowledge of the relevant facts to question [her] impartiality in the matter.'"

34. On August 20, 2012, after she attended the Roundtable, Judge Tabaddor sought clarification of Rosenblum's recommendation that she recuse herself from cases involving individuals from Iran. She specifically asked that Rosenblum identify why her activities in the Iranian-American community would create an appearance of bias or impropriety, including whether it was because she is Iranian-American. Judge Tabaddor stated that she is aware of other Immigration Judges who have been active in their ethnic and religious communities, but who had not been subject to blanket recusal recommendations like the one being imposed on her. For this reason, she questioned Rosenblum as to whether she was being held to the same standard as other Immigration Judges who are of a certain racial or ethnic group or religion and participate in community activities involving that group or religion. In so doing, Judge Tabaddor protested the Agency's discriminatory acts on account of her national origin, race and religion. She specifically stated, "Is it because I am an Iranian-American?" She also specifically requested that OGC provide a "fully analyzed opinion on the issue along with specific instructions" *or* that "the ethics office reconsider [Rosenblum's] 'recommendation' and clarify the record on the matter."

## C.    Judge Tabaddor is Ordered to Recuse Herself from All Cases Involving Individuals from Iran

35. On August 28, 2012, Defendant Rosenblum responded to Judge Tabaddor's August 20, 2012 email by, among other things, escalating the OGC opinion from a

recommendation to an order.  The email stated that Judge Tabaddor "*should disqualify* [herself] from cases involving respondents from Iran to avoid any appearance problems." In so deciding, Rosenblum did not cite any specific reasons why Judge Tabaddor's activities in the Iranian-American community would create an appearance of bias.   Rather, Rosenblum made blanket, unsubstantiated conclusions regarding Judge Tabaddor, stating:

> You are a prominent advocate for the Iranian-American community, and your activities are well-documented in the public domain, including but not limited to the internet. You engage in advocacy at such a high level that you were invited by the White House Office of Public Engagement to speak on behalf of the Iranian-American community, and your speeches, presentations, and advocacy are widely available.

36. Rosenblum failed to cite a single example of any activities he, or anyone else, timely considered as a basis for his decision, let alone explain how Judge Tabaddor's involvement in them would create an appearance of impropriety.  *In fact, he conceded that "in no way is OGC suggesting that you have an actual bias."*

37. In his August 28, 2012 email Rosenblum further stated that while Judge Tabaddor could choose the outside activities she wished to participate in, "those choices may have *consequences*, such as [her] ability to participate in particular matters officially." (emphasis added). For this proposition, Rosenblum cited 5 C.F.R. § 2635.502(b)(1)(v).  But that section only defines "covered relationship" to include *organizations* in which a federal employee is an active participant.  The operative force of the term "covered relationship," however, is contained in 2635.502(a), which provides that an employee may need to question his impartiality if he or she knows that a person with whom the employee has a covered relationship "is or represents a party [in] a particular matter involving specific parties". *The organizations in which Judge Tabaddor had been an active participant were not at any time a party in a particular matter, nor did those organizations at any time represent any party before Judge Tabaddor.*  Indeed, the text of 5 C.F.R. Part 2635 instructs that "Nothing in this section shall be construed

to suggest that an employee should not participate in a matter because of his political, religious or moral views."   Rosenblum's application of 5 C.F.R. § 2635.502  was implausible on its face.

38. In his August 28, 2012 email Rosenblum claimed that OGC had recommended that Immigration Judges disqualify themselves "from a particular class of matters in similar circumstances," but he did not identify those other matters.   Further, Rosenblum did not state that OGC had ever required an Immigration Judge to recuse himself or herself from an entire class of respondents, *in perpetuity*, as to *any* matter, without any actual finding of an appearance of impropriety based on facts. Rosenblum additionally did not state that he had actually considered such matters at the time he made the recusal recommendation or the recusal order.  He also did not identify what authority was being relied on to impose mandatory recusals in any of those cases, what type of investigation was undertaken, or the manner in which such recusal issues were raised.

39. In an email dated September 5, 2012, Judge Tabaddor requested further clarification of Rosenblum's recusal order, including whether it was the official position of the EOIR and information as to who had participated in making the decision to issue the recommendation and order.  She also reiterated her request that the order be reviewed.

40. On September 7, 2012, Rosenblum confirmed that his recusal order was the official position of OGC and  Rosenblum foreclosed any further review of the order stating unequivocally that "it was not 'reviewable' by another entity."  Rosenblum specifically represented that the order was not reviewable by the Professional Responsibility Advisory Office of the DOJ, which Rosenblum stated "offers guidance on the professional rules conduct [sic], not the Standards of Ethical Conduct for Employees of the Executive Branch (*i.e.* 5 C.F.R. Part 2635)." Further, only "based on [Judge Tabaddor's] inquiry" did Rosenblum consult with the Departmental Ethics Office, which Rosenblum represented "confirmed the OGC's

opinion." Rosenblum did not, however, provide any formal, written opinion from DEO, or state what exactly had been confirmed by the DEO.

41. In an email dated September 10, 2012, from Judge Tabaddor to ACIJ Fong, Judge Tabaddor again protested the recusal order by stating that she "disagree[s] with the characterization of the facts and the conclusions of the EOIR OGC." She also pointed out that the order was not consistent with EOIR rules, which do not contemplate recusals under the current circumstances where, among other things, it is not initiated by the parties to a case or by the Immigration Judge. Judge Tabaddor stated that she understood the OGC to have ordered her recusal and was "seeking instructions on how [ACIJ Fong] would like [her] to proceed next."

42. That same day, ACIJ Fong responded stating "Yes. . . this is OGC's conclusion" and indicating he and Judge Tabaddor would "sit down" in the next week to "see how we will do this." Thereafter, as instructed by ACIJ Fong, Judge Tabaddor drafted orders of recusal for each of the cases before her that involved Iranian nationals. Judge Tabaddor, then, corresponded with ACIJ Fong regarding the content of the orders to be issued in those cases, in the course of which ACIJ Fong stated that Judge Tabaddor was "free to ignore" his "suggested revisions" as these would be orders issued "under [Judge Tabaddor's] signature." Judge Tabaddor, then, asked ACIJ Fong to confirm that she was "under [ACIJ Fong's] order to recuse myself from all Iranian national cases effective immediately." ACIJ Fong responded: "You are directed by me to do so as the OGC has stated that is what they require."

43. Based on this instruction, but under protest, Judge Tabaddor issued recusal orders in the eight cases on her docket (two of which were consolidated cases) involving ten respondents from Iran, the majority of which had progressed well beyond the initial stages.

44. Judge Tabaddor remains subject to the recusal and reassignment order, which is of infinite duration and precludes her from hearing or being assigned any

cases involving Iranian nationals. That is, over the past two years and continuing indefinitely, Judge Tabaddor has not been assigned a single case involving an Iranian national. Judge Tabaddor, thus, continues to be singled out in her treatment vis-à-vis other Immigration Judges who are randomly assigned cases. This continuing blanket disqualification from an entire class of cases interferes with the adjudicatory process. Assignments are to be random, and reassignments may only be imposed to ensure the efficient disposition of pending cases (*i.e.*, workload balancing), not for substantive reasons, such as the race or national origin of the subject, as is the case here.

45.  Because of the discriminatory treatment, Judge Tabaddor is segregated from her similarly situated colleagues both in her job authority and in being subject to different case assignment and recusal standards. Such has materially affected the terms, conditions and privileges of Judge Tabaddor's employment and caused Judge Tabaddor anguish and humiliation.

46. Further, the Agency's policy of applying regulations relating to Immigration Judge recusals in an overly broad manner operates to substantially chill the free speech and associational rights outside of the workplace, not only of Judge Tabaddor, but of Immigration Judges in general.

### D.    No Reasoned Process was Undertaken in Issuing the Recusal Order

47. On information and belief, there is a near complete absence of any contemporaneous records relevant to the actions taken against Judge Tabaddor with respect to the recusal recommendation and recusal order at the time they were issued.  On information and belief, neither Defendant Rosenblum nor Defendant Fong, nor any one else within the DOJ, engaged in any substantive deliberative process in issuing the recusal recommendation and recusal order.  On information and belief, the Agency did not engage in any analysis of the recusal recommendation and order imposed upon Judge Tabaddor vis-à-vis any other

recusal recommendations or orders involving Immigration Judges, or for that matter other DOJ employees, until, if at all, after the recusal recommendation and order.

48. The Agency did not engage in any meaningful factual investigation, legal or policy analysis, use of a uniform process, or consultation with key ethics personnel. In particular, as touched on above, in issuing the recusal recommendation and order, Defendants Rosenblum and Fong failed to consult with Hunt, who at all times relevant to the Complaint was the Deputy Designated Agency Ethics Official ("DDAEO").  Rosenblum's failure to consult with the DDAEO is particularly egregious where Rosenblum's position as Chief Counsel of the Employee Labor Relations Unit placed him in a position of conflict of interest, a conflict even recognized by the Agency during the EEO administrative process that preceded this Complaint.

49. Under oath, Hunt has stated that "it was inappropriate to require Judge Tabaddor to recuse herself from all cases involving Iranians" and has further stated that "the [recusal] order was discriminatory."  Moreover, Hunt has stated the he is "not aware of any immigration judge (IJ) or other EOIR staff member being required to recuse themselves from cases involving members of their prospective national origin."

50.  Rosenblum has stated that in issuing the recusal order, he consulted with approximately four others, particularly Wahowiak, as well as OCG attorney Rena Scheinkman ("Scheinkman") and Kathleen Silbaugh ("Silbaugh") of the DOJ's Departmental Ethics Office. In so consulting, Rosenblum disseminated materially misleading information as to the nature of the Roundtable event, misrepresenting that Judge Tabaddor was invited to "speak" at the White House.

51.  Wahowiak, who at all times relevant to the Complaint was supervised by Rosenblum, advised Scheinkman of the propriety of the recusal order on August 22, 2012. Her advice was based on the number of results generated by a Google search for "Ashley Tabbador" [sic] and "Iran" and a single line in Judge Tabaddor's

UCLA faculty profile which stated she is a leader in the Iranian-American community.  From this exceedingly superficial inquiry, Wahowiak came to the conclusion that Judge Tabaddor has a "prominent role in the Iranian-American community at large" and is an "advocate/activist for a group which may have a direct interest in a matter before the immigration court."  Not only does this search directly establish that Judge Tabaddor's race and/or national origin were the basis for the action taken against her, but the number of Google search returns generated does not even conceivably support the conclusions reached. Among other things, given that Judge Tabaddor was born in Iran, any general recitation of her background could include the word "Iran" without any connection whatsoever to advocacy, yet alone advocacy relating to any "matter before the immigration court."

52. Thus, based on the results of a single Google search, for which no records were maintained, and for which care was not even taken to spell Judge Tabaddor's name correctly, Rosenblum determined Judge Tabaddor was required to be recused from any cases involving Iranian nationals *in perpetuity* and ACIJ Fong ordered the same. But, the Google search was itself an attempt to belatedly remedy the paucity of facts supporting the Agency's decision. Even this Google search did not occur until *after* Rosenblum had already recommended Judge Tabaddor's recusal.

53. On information and belief, neither Rosenblum nor ACIJ Fong sought the advice of the Professional Responsibility Advisory Office in connection with the recusal recommendation and/or order and neither consulted with the Office of Professional Responsibility in any manner.  Moreover, on information and belief, neither the Director of EOIR, the General Counsel of EOIR, the Chief Immigration Judge nor the Attorney General authorized or participated in the decision to recommend and then order Judge Tabaddor's indefinite recusal from all cases involving Iranian nationals.

54. On information and belief, at the time Judge Tabaddor was recommended and then ordered recused, no Immigration Judge had been subject to a blanket

recusal and reassignment order, in perpetuity, based on their activity in or association with groups reflecting their national origin, religion and/or race. On information and belief, at the time Judge Tabaddor was recommended and then ordered recused, no Immigration Judge had been subject to a blanket recusal and reassignment order from any class of cases in perpetuity. On information and belief, there are Immigration Judges who have been active in their ethnic and/or religious communities, or who have been invited to Congress and the White House in connection with civic engagement associated with the same, but who have not been subject to blanket recusal and reassignment orders from cases involving respondents that are identified with those same communities.

55. ACIJ Fong ordered Judge Tabaddor's recusal and case reassignments based upon what he has stated was a requirement and order given by Rosenblum. On information and belief, ACIJ Fong did not undertake any independent review of the recusal recommendation or order. ACIJ Fong has stated on the record that he did not discuss or seek the advice of anyone at EOIR in connection with Judge Tabaddor's ordered recusal and case reassignments. ACIJ Fong has stated that recusal decisions are made on an individualized case-by-case basis at the instigation of a litigant involved (by way of motion) or an Immigration Judge himself/herself. Judge Tabaddor was, and continues to be, prevented from exercising her right and privilege as an Immigration Judge to use her independent judgment to objectively determine whether to recuse herself from cases as required by applicable rules, policies and regulations, and is being held to different recusal and disqualification standards and procedures than other EOIR employees, including other Immigration Judges. As a result, Judge Tabaddor is being prevented by the Agency from upholding her oath of office.

### E.    On its Face, the Recusal Order Was Issued on Account of Judge Tabaddor's National Origin, Race and/or Religion

56. Judge Tabaddor's nationality, race, and/or religion and/or her association with persons of a certain nationality, race, and/or religion, were the sole and/or motivating reasons for the recusal order.

57. Hunt, the DDAEO at the relevant time, has attested that the recusal order is discriminatory.

58. Silbaugh has stated that Rosenblum presented the recusal issue as "including that the Immigration Judge (IJ) Tabaddor *is Iranian*, and she was going *to speak at a White House event about issues specific to the Iranian community*."

59. Wahowiak's advice that the recusal order be issued was based on the connection between Judge Tabaddor's (misspelled) name and the word "Iran."

60. On its face, the recusal order was motivated by Judge Tabaddor's national heritage and association with Iranian-Americans.

### F.    There is No Legitimate, Non-Discriminatory Basis for the Recusal Order

61. There is no valid non-discriminatory reason for the recusal order.  In issuing the recusal recommendation, and then the order as implemented by ACIJ Fong, Rosenblum stated that Judge Tabaddor's activities in the Iranian-American community require recusal under 5 C.F.R. §2635.502.  This has no basis in fact or law and is pretext for discrimination on account of Judge Tabaddor's race, national origin and/or religion as well as her association with groups identified with the same.  More specifically, 5 C.F.R. § 2635.502(a) provides as follows (emphasis added):

> Where an employee knows that *a particular matter involving specific parties* is likely to have a direct and predictable effect on the financial interest of a member of his household, *or knows that a person with whom he has a covered relationship is or represents a party* to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of

the appearance problem and received authorization from the agency designee in accordance with paragraph (d) of this section.

62. In turn, a "covered relationship" is defined by the regulations as including, "persons with whom the employee or a member of the employee's household has a close personal, contractual or financial relationship, or "an organization, other than a political party described in 26 U.S.C. § 527(e), in which the employee is an active participant."   As referenced above, the OGE has issued a Legal Advisory, dated October 4, 2006, emphasizing that the phrase "particular matter involving specific parties" is to be narrowly construed, that the reference to specific parties forecloses application of the regulation in the context of "broader types of particular matters," and that application requires analysis on a case-by-case basis.  One thing is clear, a "covered relationship" does not apply to a person's identification with political, religious—or for that matter, racial—groups.   5 C.F.R. Part 2635.502 expressly instructs that "Nothing in this section shall be construed to suggest that an employee should not participate in a matter because of his political, religious or moral views."

63. There is no evidence, or even an allegation, that Judge Tabaddor's involvement in cases involving Iranian nationals in any way implicates a financial interest in the outcome of those cases.  There is no evidence or claim by Defendants Rosenblum or Fong, or any one else within the DOJ or EOIR, that any of the organizations with which Judge Tabaddor has been involved represents Iranian refugees or nationals, or that these organizations have been or would be parties before her in her capacity as an Immigration Judge.  There is also no evidence that Judge Tabaddor's speech and associational activities, in her personal capacity, pertain to any advocacy for Iranian nationals seeking asylum or other immigration benefits in the United States.

64. Moreover, Rosenblum failed to consider that the constituency (Iranian-*Americans*) with which Judge Tabaddor was deemed to be identified in connection

with her pro-bono and public service activities (that is, the alleged "covered relationship"), was entirely different than the specific constituency Rosenblum identified for recusal and reassignment of cases ("individuals from Iran").  That distinction, in and of itself, renders the issue of Judge Tabaddor's civic and community service activities outside the applicable scope of 5 C.F.R. Part 2635.502 as it pertains to the cases defined in the order. Furthermore, the Agency's policy of enforcement of 5 C.F.R. Part 2635.502 to incorporate an entire race or persons of a defined national origin defies the tenants of equal justice under the laws, as well as common sense. The order of recusal and reassignment imposed upon Judge Tabaddor is no different than an order that would require an African-American Immigration Judge who was a prominent member of the National Urban League, the African-American Speaker Bureau and/or the National Bar Association and who participated in pro-bono and community service activities in connection with such organizations to be barred from hearing any cases involving "individuals from Africa."  Such an order, particularly if the order was based on the results of an internet search of the person's name and "Africa[n]" would be immediately reviled as a most despicable form of racial profiling and discriminatory behavior.  It also would be unsupportable, where there would be no reasonable relationship between participation in African-*American* causes and cases involving immigrants from Africa. In fact, there is *no difference* between such a hypothetical order and the order that has been issued as against Judge Tabaddor.

65. As is obvious from this hypothetical, the order here constitutes a particularly harmful and insidious form of racial profiling and discrimination, in that it affects not only Judge Tabaddor but also the applicants in the cases that would otherwise have randomly been assigned to come before her. The order against Judge Tabaddor also impairs the proper functioning of the immigration laws, ultimately placing due process in question.  The fact that this very discriminatory manner of enforcement of 5 C.F.R. Part 2635 has been and is continuing to be maintained by

Justice Department—the arm of government that is charged with dispensing justice and ensuring equal rights for all—only adds to the outrage.

66. Likewise, there is substantial significance to the fact that the order was a "blanket" recusal order—applying indefinitely to *any* matter involving Iranian nationals. Among other things, the recusal order is violative of DOJ policy (as set forth in the Operating Policies and Procedures Memorandum 05-02: Procedures for Issuing Recusal Orders in Immigration Proceedings, issued by The Office of the Chief Immigration Judge on September 14, 2000) which directs that "[b]lanket, or broad disqualifications of a judge should be carefully considered, since the *compelling evidence standard* dictates that *judges* examine and analyze each case *individually* to make a determination that disqualification is required." (emphasis added). This policy further directs that "broad recusals should only be considered in those circumstances in which the statute [28 U.S.C. § 455(b)] mandates automatic disqualification."  There is no evidence, or even an allegation, that Judge Tabaddor would be subject to mandatory recusal under 28 U.S.C. § 455(b), which requires a specific finding of "actual" bias.  Rather, Defendant Rosenblum has admitted there is no allegation, much less a finding, of actual bias.

67.  The Agency's failure to consider and meet the standards set forth in these authorities, as well as other applicable law and policies, is further evidence that the stated reason for the recusal order is pretextual, and that Judge Tabaddor has been intentionally singled out for unfavorable treatment on account of her race, national origin and/or religion in violation of Title VII.

68.  The explanation proffered by the Agency as to the basis for the recusal recommendation and order is implausible, uninformed and legally impermissible, being inconsistent with applicable law and regulations as well as DOJ written policies and practice.  Furthermore, the absence of any meaningful investigation and analysis prior to issuing the recusal recommendation and order renders the conclusion reached by Rosenblum and adopted by ACIJ Fong inherently flawed

and as such, unworthy of credence. In addition, the Agency has been inconsistent in the manner which they have sought to characterize Judge Tabaddor's outside activities.

69. After Judge Tabaddor protested the recusal order, on November 29, 2012, Rosenblum sought to impose another blanket recusal recommendation, this time directed to an Armenian-American Immigration Judge, to be recused from any matters involving individuals from Armenia, if the Immigration Judge attended a meeting with the United States Ambassador to Armenia. This is inconsistent with the standard applied to Judge Tabaddor where the mere invitation to attend the Roundtable meeting was relied upon by Rosenblum as the most significant factor in ordering Judge Tabaddor's recusal.   On information and belief, the Armenian-American Immigration Judge referred to earlier in this paragraph was not actually recommended or ordered recused from any class of cases because she ultimately, did not attend the meeting in that it was determined that she would have been attending as a representative of the Armenian Bar Association, which representative capacity was deemed impermissible under 18 U.S.C. § 205. The proposed blanket recusal of the Armenian-American Judge does, however, demonstrate that the Agency has a policy of applying its regulations relating to Immigration Judge recusals in an overly broad manner, and contrary to the dictates of 5 C.F.R. Part 2635, which requires the determination to be made as to specific matters and specific persons.   The Agency's overbroad application of this regulation to support blanket recusals where the parties and cases are not even foreknown, creates a cloud of suspicion over Immigration Judges' extra-curricular activities involving specific racial and/or religious groups generally and thereby prospectively chills the free exercise of the rights of speech and assembly outside of the workplace.

### G. Judge Tabaddor is Subject to Adverse Action as a Result of Engaging in Protected Activity

70. As set forth above, Judge Tabaddor sought leave to attend the Roundtable event from her direct supervisor, ACIJ Fong. ACIJ Fong initially indicated he was not inclined to grant Judge Tabaddor's request for leave. When Judge Tabaddor protested the decision, the matter was escalated by ACIJ Fong to Rosenblum who as stated above, was the Chief Counsel of the Agency's Employee/Labor Relations Unit, which, *inter alia*, deals with employee discipline issues. Rosenblum approved Judge Tabaddor's attendance at the Roundtable event, but recommended she recuse herself from all cases involving individuals from Iran. Directly after Judge Tabaddor protested the recusal recommendation as unlawful, Judge Tabaddor was *ordered* recused from all cases involving individuals from Iran, *in perpetuity*. The Agency subjected Judge Tabaddor to adverse employment actions because of her participation in protected activities, that is, in opposing an action Judge Tabaddor reasonably believed to be discriminatory. The recusal order imposed upon Judge Tabaddor would dissuade a reasonable worker from making or supporting a charge of discrimination.

71. Additionally, beginning within days after protesting the recusal recommendation and later continuing to protest the recusal order, Judge Tabaddor was also made subject to newly-imposed restrictions in connection with outside speaking activities in her personal capacity. In particular, after protesting the Agency's unlawful conduct, Judge Tabaddor was suddenly denied use of her title (with an appropriate disclaimer) in connection with approvals for outside speaking engagements where, prior to protesting her recusal, she had been approved to use her title (with an appropriate disclaimer) in connection with the exact same outside activities. No reason was given for the change in treatment.

72. On information and belief, EOIR has no uniform policy restricting Immigration Judges in the their use of title and a disclaimer with respect to outside

activities for which Immigration Judges participate in their personal capacities. The restrictions on Judge Tabaddor's use of title, with an appropriate disclaimer, would not have occurred had Judge Tabaddor not protested the recusal recommendation and order.   The restrictions imposed upon Judge Tabaddor would dissuade a reasonable worker from making or supporting a charge of discrimination.

73. Similarly, after Judge Tabaddor filed her EEO complaint of discrimination, the Agency took further adverse employment actions against Judge Tabaddor for having done so by suddenly denying her ability to be compensated for teaching courses relating to immigration law at UCLA, contrary to the provisions of the applicable regulation, 5 C.F.R. § 2635.807.  This denial of compensation was after Judge Tabaddor had been approved to receive compensation for teaching substantially the same immigration law related courses, prior to filing her EEO complaint.  The restriction on Judge Tabaddor's ability to receive compensation for teaching at an institution of higher learning would dissuade a reasonable worker from making or supporting a charge of discrimination.

## FIRST CAUSE OF ACTION

### Violation of First Amendment (Declaratory Relief; Injunctive Relief)

### (All Defendants)

74. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

75. The Agency has a policy of enforcing 5 C.F.R. Part 2635 and associated Agency policies relating to the recusal of Immigration Judges in a manner that chills potential speech and association by Immigration Judges.   The Agency's enforcement of 5 C.F.R. Part 2635 and associated Agency policies relating to the recusal of Immigration Judges based upon speech and association with particular groups is overly broad and induces Immigration Judges to curtail their expressive and speech related activities outside of the workplace.   Such restrictions are not narrowly tailored and they deter speech on matters of public concern and

association wholly unrelated to the Immigration Judges' government employment based on content and in a prospective manner.  The Agency has no compelling or substantial interest in such enforcement, and additionally, such enforcement is not necessary for the Agency to operate efficiently and effectively.

76. Plaintiff thus seeks entry of a judgment declaring the Agency's conduct unconstitutional in violation of the First Amendment and for injunctive relief to enjoin the Agency from enforcing or applying its recusal policies in such a manner.

## SECOND CAUSE OF ACTION

## Unconstitutional Overbreadth of Agency's Policy of Enforcing

## Regulation (Declaratory Relief; Injunctive Relief)

## (All Defendants)

77. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

78. The Agency has and continues to maintain a policy of enforcing 5 C.F.R. Part 2635.502 and associated Agency policies relating to the recusal of Immigration Judges in a manner that is constitutionally overbroad and in derogation of the enabling statutes.  The language of 5 C.F.R §2635.502(a) states that an employee is to be disqualified from *a particular matter involving specific parties* only when an employee knows that *a particular matter involving specific parties* is likely to have a direct and predictable effect on the financial interest of a member of his household, *or knows that a person with whom he has a covered relationship is or represents a party* to such matter.

79. In turn, a "covered relationship" is narrowly defined in 5 C.F.R. 2635.502(b) as including, "persons with whom the employee or a member of the employee's household has a close personal, contractual or financial relationship, or "an organization, other than a political party described in 26 U.S.C. § 527(e), in which the employee is an active participant."

80. Here, the Agency is construing "covered relationship" not to mean any particular person or organization, but rather to mean a person's general identification with any particular national origin or a political, religious or racial group. This is inappropriate. C.F.R. Part 2635.502 expressly instructs that "Nothing in this section shall be construed to suggest that an employee should not participate in a matter because of his political, religious or moral views."

81. 5 CFR 2635.502(b)(3) also states that "particular matter" has the meaning set forth in has the meaning set forth in 5 C.F.R. §2637.102(a)(7), which states: "Particular Government matter involving a specific party means any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving *a specific party or parties* in which the United States is a party or has a direct and substantial interest" (emphasis added).

82. As referenced above, the OGE has issued a Legal Advisory, dated October 4, 2006, emphasizing that the phrase "particular matter involving specific parties" is to be narrowly construed, that the reference to specific parties forecloses application of the regulation in the context of "broader types of particular matters," and that application requires analysis on a case-by-case basis.

83. Here, the Agency is defining "particular matter involving specific parties" as *any* potential matter that might involve *any* Iranian national, prospectively, in perpetuity, regardless of the actual identities of the specific parties.  This is inappropriate, where the plain language require a case-by-case and very specific determination. Such a construction is not supportable under the plain language of  5 C.F.R. §2637.102(a)(7) and the authorizing statutes for the same.

84. The Agency's construction and application of 5 C.F.R. Part 2635 and associated Agency policies relating to the recusal of Immigration Judges is directly contrary to Congressional intent and can be supported neither by the express language of the regulation nor the applicable statutes under which such regulation is

1  promulgated, including without limitation, 5 U.S.C. App. §101 *et seq.*  As a result,
2  the Agency's construction of 5 C.F.R. Part 2635 and associated Agency policies
3  relating to the recusal of Immigration Judges is constitutionally overbroad and is
4  therefore void.

5  85. Plaintiff thus seeks entry of a judgment declaring the Agency's policy of
6  enforcing 5 C.F.R. Part 2635.502 and associated Agency policies relating to the
7  recusal of Immigration Judges unconstitutional and for injunctive relief to enjoin
8  the Agency from enforcing or applying its recusal policies in such a manner.

9  ### THIRD CAUSE OF ACTION

10  ### Unlawful Discrimination in Violation of Title VII

11  ### (Defendant Holder)

12  86. Plaintiff repeats and realleges each and every allegation set forth in the
13  preceding paragraphs of the Complaint as if fully set forth herein.

14  87. The Agency discriminated against Judge Tabaddor with the respect to the
15  terms, conditions and privileges of her employment on the basis of her national
16  origin, race and religion in violation of Title VII.

17  88. The Agency singled out Judge Tabaddor for adverse treatment in
18  recommending and then ordering her recusal from all cases involving individuals
19  from Iran.  A perpetual recusal order and case reassignment of this nature is
20  unprecedented. Judge Tabaddor's nationality, race, and/or religion and association
21  with the same, were the sole and/or motivating reasons for the recusal and
22  reassignment order.

23  89. On its face the recusal/case reassignment recommendation and order were
24  based upon Judge Tabaddor's race, national origin and association with Iranian-
25  Americans.

26  90. The recusal/case reassignment recommendation and order were issued
27  without any due deliberation by the Agency, including without factual

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

110492886 v8

30.

investigation, legal or policy analysis, use of a uniform process, or consultation with key ethics personnel.

91. The recusal/case reassignment recommendation and order are unsupported by any law, regulation or policy and are factually baseless.  The reasons proffered by the Agency for issuing the recusal/case reassignment recommendation and order are implausible, inherently flawed, inconsistent, uninformed and unworthy of credence.

92. The Agency's actions have undermined Judge Tabaddor's essential judiciary function in making recusal/reassignment decisions on a case-by-case basis and exercising unimpaired judicial independence and have restricted her official duties. Further, the Agency has caused Judge Tabaddor to perform her duties as an Immigration Judge under the stigma of having had her impartiality impugned. Judge Tabaddor is segregated from her similarly situated colleagues both in her job authority and in being subject to different case assignment and recusal standards.

93. By reason of the Agency's intentional discrimination, Plaintiff has suffered severe harm and is entitled to all remedies available under Title VII.

## FOURTH CAUSE OF ACTION

### Unlawful Retaliation in Violation of Title VII

### (Defendant Holder)

94. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

95. The Agency unlawfully retaliated against Plaintiff for opposing any denial of leave to attend the Roundtable event, which sought to convene members of the Iranian-American community, and opposing the recommendation and order that she recuse herself and all cases be reassigned from the entire class of cases involving Iranian nationals.

96. Directly after Judge Tabaddor protested the recusal/case reassignment recommendation as unlawful, Judge Tabaddor was ordered recused and reassigned

from all cases involving individuals from Iran in perpetuity.   The recusal/case reassignment would not have occurred in the absence of Judge Tabaddor having engaged in protected activity, including challenging any denial of leave and protesting the recusal/case reassignment recommendation.   The recusal/case reassignment order imposed upon Judge Tabaddor would dissuade a reasonable employee from making or supporting a charge of discrimination.

97. Beginning within days after protesting the recusal recommendation and later continuing to protest the recusal/case reassignment order, Judge Tabaddor was subject to restriction in connection with outside speaking activities in her personal capacity.   The restrictions on Judge Tabaddor's use of title, with an appropriate disclaimer, would not have occurred had Judge Tabaddor not protested the recusal/case reassignment recommendation and order.   The restrictions imposed upon Judge Tabaddor would dissuade a reasonable worker from making or supporting a charge of discrimination.

98. Likewise and relatedly, after Judge Tabaddor filed her EEO complaint of discrimination, the Agency took further adverse employment actions against Judge Tabaddor because of having done so in denying her ability to be compensated for teaching courses relating to immigration law at UCLA, contrary to the provisions of the applicable regulation, 5 C.F.R. § 2635.807. This denial of compensation was after Judge Tabaddor had been approved to receive compensation for teaching substantially the same  law related courses, prior to filing her EEO complaint. The restriction on Judge Tabaddor's ability to receive compensation for teaching at an institution of higher learning would dissuade a reasonable worker from making or supporting a charge of discrimination.

99. By reason of the Agency's retaliation, Plaintiff has suffered severe harm and is entitled to all available remedies under Title VII.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

a.  Awarding all remedies available under Title VII, including:

   i.   Injunctive relief requiring the Agency to reverse the order that Judge Tabaddor recuse herself from all cases involving respondents from Iran;

  ii.   Injunctive relief requiring that Judge Tabaddor resume being randomly assigned cases in the same manner as other Immigration Judges and consistent with the needs of the Immigration Courts' docket;

 iii.   Injunctive relief requiring  that Judge Tabaddor be permitted to exercise her independent judgment to decide whether or not to recuse herself from cases on an individualized basis;

 iv.   Injunctive relief requiring a formal written retraction and withdrawal of the recusal recommendation and order reflecting the illegality complained of herein;

  v.   Injunctive relief requiring a formal written acknowledgement that the Agency's order of recusal was not based on any allegation or evidence or showing of bias by Judge Tabaddor, and that Judge Tabaddor has, at all times, performed her duties free from bias and in a judicially impartial manner;

 vi.   Injunctive relief requiring that the DOJ will review EOIR's policies and procedures to ensure that 5 C.F.R. §2635.502 may not be applied in a discriminatory, unequal or unconstitutionally overbroad manner by executive branch officials against Immigration Judges and requiring mandatory training thereon; and

 vii.   Nominal, consequential, compensatory and punitive damages in an amount to be determined at trial; and

viii.   Costs and expenses, including reasonable attorneys' fees;

1    b.  Declaring that the Agency has violated the First Amendment and for further

2  necessary or proper relief based on such declaratory judgment, including an

3  injunction:

4      i.    Invalidating the Agency's policy under 5 C.F.R. §2635.502 of executive

5           branch officials ordering recusals from classes of cases based upon

6           Immigration Judges' speech and associational activities outside of the

7           workplace and requiring mandatory training thereon; and

8    c.  Declaring that the Agency's policy of enforcing 5 C.F.R. Part 2635.502 is

9  constitutionally overbroad and in derogation of the enabling statutes and for further

10  necessary or proper relief based on such declaratory judgment, including an

11  injunction:

12        i.    Invalidating the Agency's policy of enforcing 5 C.F.R. Part

13             2635.502 and associated Agency policies relating to the recusal of

14             Immigration Judges; and

15    d.  Granting such further relief as the Court deems just and proper.

16

17  Dated:       October 3, 2014          COOLEY LLP
                                          ALI M. M. MOJDEHI (123846)
18                                        JANET DEAN GERTZ (231172)
                                          ALLISON M. REGO (272840)
19

20

21                                        /s/ Ali M.M. Mojdehi
                                          Ali M. M. Mojdehi (123846)
22
                                          Attorneys for Plaintiff
23                                        Immigration Judge A. Ashley Tabaddor

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2          Pursuant to Local Rule 38-1 of the Local Rules of the United States District

3   Court for the Central District of California, Plaintiff hereby demands a trial by jury.

4   Dated:          October  3, 2014          COOLEY LLP
                                             ALI M. M. MOJDEHI (123846)
5                                            JANET DEAN GERTZ (231172)
                                             ALLISON M. REGO (272840)
6

7
                                             /s/ Ali M.M. Mojdehi
8                                            Ali M. M. Mojdehi (123846)

9                                            Attorneys for Plaintiff
                                             Immigration Judge A. Ashley Tabaddor
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28