1    COOLEY LLP
     ALI M. M. MOJDEHI (123846)
2    (AMOJDEHI@COOLEY.COM)
     JANET DEAN GERTZ (231172)
3    (JGERTZ@COOLEY.COM)
     JON F. CIESLAK (268951)
4    (JCIESLAK@COOLEY.COM)
     ALLISON M. REGO (272840)
5    (AREGO@COOLEY.COM)
     4401 Eastgate Mall
6    San Diego, CA  92121
     Telephone:   (858) 550-6000
7    Facsimile:   (858) 550-6420

8    Attorneys for Plaintiff
     Immigration Judge A. Ashley Tabaddor
9

10                UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13   AFSANEH ASHLEY TABADDOR,          Case No.  2:14-cv-06309-GW-CW

14                Plaintiff,

15         v.                          **OPPOSITION TO MOTION TO
                                       DISMISS**
16   ERIC H. HOLDER, JR., *et al.*,

17                Defendants.          Hearing
                                       Date: April 23, 2015
18                                     Time: 8:30 a.m.
                                       Courtroom: 10
19                                     Judge: Hon. George H. Wu

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

114006721 v10

**Table of Contents**

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | STANDARD ON MOTION TO DISMISS | | 5 |
| III. | FACTUAL BACKGROUND | | 7 |
| | A. | The Justice Department Affirmatively Encourages Employee Participation in Community Service and Civic Activities | 7 |
| | B. | Judge Tabaddor's Indefinite, Race and Nationality-Based Recusal Cannot Stand | 8 |
| | | 1. The Recusal Recommendation and Order | 8 |
| | | 2. The Agency Order was Issued in the Absence of Any Due Deliberation | 11 |
| | | 3. The Agency's Retaliatory Conduct Following Judge Tabaddor's Challenge to her Recusal | 13 |
| IV. | JUDGE TABADDOR'S CONSTITUTIONAL CLAIMS CAN BE HEARD IN THIS COURT | | 15 |
| | A. | Judge Tabaddor's Constitutional Claims are Outside the Scope of the CSRA | 16 |
| | | 1. Immigration Judges are Required to Exercise Independent Judgment with Respect to the Cases that Come Before Them | 17 |
| | | 2. Plaintiff's Constitutional Claims Involve Matters Outside of the Workplace | 20 |
| | B. | Judicial Review of Conflict of Interest and Ethics Rules and Regulations was Specifically Provided for by Congress | 21 |
| V. | JUDGE TABADDOR'S CLAIMS UNDER TITLE VII ARE NOT SUBJECT TO DISMISSAL | | 26 |
| | A. | Judge Tabaddor has Stated a Claim for Discrimination | 26 |
| | | 1. Judge Tabaddor Contacted an EEO Counselor Within 45 Days of the Discriminatory Employment Action | 26 |
| | | 2. The Government's Racial Discrimination Constitutes an Adverse Employment Action | 28 |
| | B. | Judge Tabaddor States a Claim for Retaliation | 31 |
| | | 1. Judge Tabaddor's Teaching Claim Is Exhausted Because It Is "Like or Reasonably Related to" Her Other Claims | 31 |
| | | 2. Defendants Committed Retaliatory Adverse Actions Against Judge Tabaddor | 32 |
| | | 3. Judge Tabaddor Alleges a Causal Link for Her Teaching Claim | 34 |
| VI. | CONCLUSION | | 35 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albino v. Baca*,
  747 F.3d 1162 (9th Cir. 2014) ................................................................ 6

*Assoc. of Administrative Law Judges v. Colvin*,
  2015 WL 294267 (7th Cir. Jan. 23, 2015) ........................................... 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 5

*Bergene v. Salt River Project Agr. Imp. & Power Dist.*,
  272 F.3d 1136 (9th Cir. 2001) ............................................................. 27

*Bragg v. Office of the Dist. Attorney*,
  704 F.Supp.2d 1032 (D. Colo. 2009) .................................................. 33

*Brown v. Board of Educ.*,
  347 U.S. 483 (1954) ............................................................................. 30

*Brown v. N.Y. State Dep't of Corr. Servs.*,
  583 F.Supp.2d 404 (W.D.N.Y. 2008) ................................................. 33

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ........................................................................ 32, 34

*Carter v. Kurzejeski*,
  706 F.2d 835 (8th Cir. 1983) ............................................................... 20

*Coleman v. Napolitano*,
  2014 WL 4185190 (D.D.C. Aug. 25, 2014) ................................... 23, 24

*Com. of Pa. v. Local Union 542, Int'l. Union of Operating Eng'rs*,
  388 F.Supp. 155 (E.D. Pa. 1974) ........................................................ 11

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ............................................................... 33

*Davis v. Billington*,
  2014 WL 2882679 (D.D.C. June 25, 2014) ........................................ 24

Cooley LLP
Attorneys At Law
San Diego

**TABLE OF AUTHORITIES**
(continued)

Page

*Demjanjuk v. Mukasey*,
514 F.3d 616 (6th Cir. 2008) .............................................................. 17

*Deweese v. Cascade Gen. Shipyard*,
2011 WL 3298421 (D. Or. May 9, 2011) ............................................ 30

*Elgin v. Department of the Treasury*,
132 S. Ct. 2126 (2012) ....................................................21, 22, 23, 24

*Faulkner v. ADT Sec. Servs.*,
706 F.3d 1017 (9th Cir. 2013) .............................................................. 5

*Firenze v. NLRB*,
2013 WL 639151 (D. Mass. Jan. 10, 2013) ........................................ 20

*Fonseca v. Sysco Food Servs. of Arizona, Inc.*,
374 F.3d 840 (9th Cir. 2004) .............................................................. 29

*Gilding v. Carr*,
608 F.Supp.2d 1147 (D. Ariz. 2009) ................................................... 19

*Keefe v. Library of Congress*,
588 F.Supp. 778 (D.D.C. 1984) .......................................................... 20

*Kloeckner v. Solis*,
133 S.Ct. 596 (2012) .......................................................................... 24

*Kraus v. Presidio Trust Facilities Div.*,
572 F.3d 1039 (9th Cir. 2009) .............................................................. 6

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
127 S. Ct. 2162 (2007) ....................................................................... 26

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) .............................................................. 7

*Lopez v. Trendacosta*,
2014 WL 6883945 (C.D. Cal. Dec. 4, 2014) ........................................ 7

*Macy v. Dalton*,
853 F.Supp. 350 (E.D. Cal. 1994) ...................................................... 25

Cooley LLP
Attorneys At Law
San Diego

iii.

**TABLE OF AUTHORITIES**
(continued)

Page

*Mahoney v. Donovan,*
721 F.3d 633 (D.C. Cir. 2013)..................................................15

*Maldonado v. Morales,*
556 F.3d 1037 (9th Cir. 2009)...............................................21

*Mangano v. United States,*
529 F.3d 1243 (9th Cir. 2008)...............................................21

*Markoff v. Superior Court,*
2014 U.S. Dist. LEXIS 87331 (E.D. Cal. June 25, 2014)...................32

*Meritor Savings Bank, FSB v. Vinson,*
477 U.S. 57 (1986) ............................................................29

*Moreno v. McHugh,*
2011 WL 2791240 (D. Md. July 14, 2011) ...............................25

*Nat'l R.R. Passenger Corp. v. Morgan,*
536 U.S. 101 (2002) ................................................27, 28, 29

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75 (1998) ............................................................29

*Ouchibon v. N. Am. Rockwell Corp.,*
482 F.2d 569 (9th Cir. 1973) .........................................31, 32

*Paul v. Davis,*
424 U.S. 693 (1976) ..........................................................30

*Perry v. Brown,*
671 F.3d 1052 (9th Cir. 2012)...........................................3, 30

*Ramirez v. U.S. Customs & Border Prots.,*
709 F.Supp.2d 74 (D.D.C. 2010) .......................................20

*Russell v. McKinney Hosp. Venture,*
235 F.3d 219 (5th Cir. 2000)..............................................27

*Santos-Reyes v. Gonzales,*
2007 WL 988182 (N.D. Cal. Apr. 2, 2007) .........................25

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Scherer v. United States,*
    241 F.Supp.2d 1270 (D. Kan. 2003) .................................................................. 23

5

6

*Sommatino v. U.S.,*
    255 F.3d 704 (9th Cir. 2001) .................................................................................. 6

7

8

*Sumner v. U.S. Postal Serv.,*
    899 F.2d 203 (2d Cir. 1990) ................................................................................. 33

9

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) ............................................................................................... 5

10

11

*Tatung Co. v. Shu Tze Hsu,*
    2014 WL 4306561, at *16 (C.D. Cal. Sept. 2, 2014) ......................................... 35

12

13

*Taylor v. Blank,*
    2014 WL 1577313 (E.D. Cal. Apr. 17, 2014) ...................................................... 6

14

15

*U.S. v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) .................................................................................. 6

16

17

*United States v. Fausto,*
    484 U.S. 439 (1988) ............................................................................................. 21

18

19

*United States v. Odeh,*
    Case No. 13-cr-20772 (E.D. Mich. filed Oct. 22, 2013) .................................. 2, 3

20

21

*Van Ee v. E.P.A.,*
    202 F.3d 296 (D.C. Cir. 1999) ...................................................................... 10, 14

22

*Vasquez v. Cnty. of Los Angeles,*
    349 F.3d 634 (9th Cir. 2003) ........................................................................ 29, 30

23

24

*Vivieratos v. U.S.,*
    939 F.2d 762 (9th Cir. 1991) .......................................................................... 6, 26

25

26

*Weaver v. U.S. Info. Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) ............................................................................ 20

27

28

*Webster v. Doe,*
    486 U.S. 592 (1998) ............................................................................................. 24

**TABLE OF AUTHORITIES**
(continued)

Page

*White v. Lee*,
   277 F.3d 1214 (9th Cir. 2000) ............................................................... 7

*Wisconsin v. Constantineau*,
   400 U.S. 433 (1971) ............................................................................... 30

**Statutes**

5 U.S.C.
   §2302(a)(2)(xii) ..................................................................................... 15
   §2302(a)(2)(A) ....................................................................................... 16
   §2302(b) ................................................................................................. 16
   §2302(b)(1) ............................................................................................. 25
   §2302(d) ................................................................................................. 15
   §3311 ..................................................................................................... 17
   §7106 ..................................................................................................... 19
   §7121 ..................................................................................................... 25
   §7121(a)(1) ............................................................................................. 24
   §7121(d) ................................................................................................. 25

5 U.S.C. app. §404 ........................................................................ 4, 15, 22, 23

28 U.S.C. §1331 ....................................................................................... 21

42 U.S.C.
   §2000e, *et seq.* ............................................................................ *passim*
   § 2000e-2(a)(1) ..................................................................................... 29

**Other Authorities**

5 C.F.R.
   §2635.106 .............................................................................................. 19
   §2635.106(c) .......................................................................................... 23
   §2638.201 .............................................................................................. 11
   §2638.301 .............................................................................................. 11
   §2635.502 ...................................................................................... *passim*
   §2635.502(a) ................................................................................. *passim*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

8 C.F.R.

4

§1003.0(b)(ii).................................................................. 18

§1003.0(d)..................................................................... 19

5

§1003.9(b)(3)................................................................. 18

6

§1003.9(c)..................................................................... 19

§1003.10(b)................................................................... 17

7

§1240.1(b)..................................................................... 18

8

Fed. R. Civ. P.

9

8(d)(3).......................................................................... 4

10

12(b)(1)...................................................................... 6, 7

12(b)(6)................................................................... 5, 6, 7

11

H.R. Conf. Rep. 95-1756 (1978) (available at 1978 WL 8586, *73) ..................... 22

12

S. Rep. 95-170 (1977) (available at 1977 WL 9629, *146) ................................ 22

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Immigration Judge Afsaneh Ashley Tabaddor ("Plaintiff" or "Judge Tabaddor"), hereby submits her Opposition to Defendants' Motion to Dismiss (Doc. 33, "Motion") her Amended Complaint (Doc. 7, "Complaint"):

## I.   INTRODUCTION

The Plaintiff, Judge Tabaddor, is an Iranian-American and is a sitting Immigration Judge. She has been required to bring this lawsuit, alleging both discrimination and constitutional challenges, after the Justice Department forced her to recuse herself from all cases involving Iranian nationals, solely because of her race, national origin and/or religion and participation in outside activities of interest to, *inter alia*, the Iranian-American community.

The legal authority purportedly relied upon by the Justice Department to justify that facially race-based edict was 5 C.F.R §2635.502(a), a regulation arising under the Ethics in Government Act. These regulations were promulgated to preserve the integrity of governmental service and decision making. They were never intended to condone discriminatory conduct or racial classifications by federal agencies. Nor were they intended be applied in a manner that imposes a general "gag order" on federal employees' private speech or association, and thus implicates serious constitutional concerns. Nor may the conflict of interest statutes be used by the Justice Department as a means to override the requirement of random assignment of cases to particular Immigration Judges, to instead base such assignments on the respondents' race and nationality. But, that is precisely the invidious conduct that is being complained of here.

Defendants move to dismiss the Complaint, relying upon strained technical arguments. In so doing, they seek to avoid having to answer the substance of the issues or address the grave policy concerns that are raised by their conduct. Defendants' Motion, in substantial part, argues that their continuing discriminatory and unconstitutional conduct should forever evade review by any Article III Court, leaving the Justice Department free to flout the law.

Perhaps recognizing the absurdity of that proposition, Defendants otherwise attempt to paint a diminished harm—repeatedly asserting that Judge Tabaddor was only forced to recuse herself from a "tiny" fraction of her docket. Defendants also argue there are no adverse effects and thus the action does not rise to the level of "discrimination." But facially discriminatory conduct is never minor, and *all* forms of discrimination are prohibited by the laws of the United States. Here, by forcing Judge Tabaddor to recuse herself from cases involving Iranian nationals, and no longer assigning her such cases, Defendants have significantly impaired Judge Tabaddor's judicial authority on an ongoing basis. Defendants' actions continue to improperly imply that Judge Tabaddor is less capable than her peers of performing her job with integrity, and thereby stigmatize her. In addition, Defendants' distortion of the federal conflict of interest regulations evinces a broader threat of enforcement of the conflict of interest statutes against Immigration Judges who wish to be active in groups of which they are members. This has continuing negative effects that broadly and adversely impact all Immigration Judges. Surely, if the Agency is permitted to reassign or prospectively limit assignment of immigration cases based upon any given judge's race or nationality, and/or the race or nationality of groups of which they associate, it will place in question the independence of the Immigration Bench and Bar, and potentially, even the fairness and due process provided under the system of immigration review.

Defendants' position stands in stark contrast to the Justice Department's recent position in a case involving a U.S. District Court judge's refusal to recuse himself on the motion of a defendant who had been charged with illegally procuring U.S. citizenship. *See United States v. Odeh*, Case No. 13-cr-20772 (E.D. Mich. filed Oct. 22, 2013). There, defendant argued that the Jewish judge had an appearance of bias based on the judge's "life long" support of the State of Israel, travel to Israel, and support of and fundraising for the Detroit Jewish Federation. [Doc. 58, 2.] In opposing the defendant's recusal motion, the Justice Department

argued that the judge's personal charitable work and travel does not form a basis for recusal; specifically, it would be "highly improper" for a judge to be recused based on "any measure" of religion or Church membership. [Doc. 53, 5.][1] Moreover, the Justice Department argued that a judge's activities outside the courtroom, even where they endorsed a particular ideology, could not support recusal. [*Id.*, 6.] It likened defendant's motion to that brought in the context of a case challenging the validity of California's Proposition 8, in which the Ninth Circuit found that it could not possibly be reasonable to presume that a judge who was himself in a same-sex relationship could not make an impartial decision. [*Id.*, 7-8 (citing to *Perry v. Brown*, 671 F.3d 1052, 1096 (9th Cir. 2012)).]

The same reasoning advocated by the Justice Department in *Odeh* applies here. It is not reasonable to question Judge Tabaddor's impartiality in hearing immigration cases involving individuals from Iran due to her race, national origin and/or religion and outside association with others of the same race and nationality, namely, Iranian-American citizens. Nor does any plausible construction of the conflict of interest statutes, regulations, or policies support the use of race-based criteria in determining which cases an Immigration Judge should hear.

Though seeking dismissal of Judge Tabaddor's constitutional claims on purely jurisdictional grounds, the Motion asserts in a number of instances that they are inconsistent with Judge Tabaddor's claims for discrimination. But this mischaracterizes the nature of Judge Tabaddor's claims. Although Judge Tabaddor has been singled out among her peers and personally injured, the actions of the Justice Department adversely impact all Immigration Judges. The Complaint alleges that the Justice Department's construction of the regulation is

---

[1] Similarly, the regulation relied upon here by Defendants to recuse Judge Tabaddor, 5 C.F.R. §2635.502, states expressly, "Nothing in this section shall be construed to suggest that an employee should not participate in a matter because of his political, religious or moral views."

unconstitutionally overbroad, where the plain language of 5 C.F.R. §2635.502 does not support a Congressional intent to prevent Immigration Judges from participating in *pro bono* public affairs on matters of public interest, particularly not when the prohibition is based solely on their race, nationality or religious affiliation. Such claims do not depend upon any other Immigration Judge having been subject to the same treatment as Judge Tabaddor. Rather, they address the vague and overbroad manner in which the Justice Department is construing and continues to apply the regulation, along with the chilling effect on other Immigration Judges' activities caused by the manner in which Judge Tabaddor has been treated. There is nothing inconsistent in bringing different claims to address different injuries.[2]

Defendants' sole basis for seeking dismissal of Plaintiff's constitutional claims is that this Court lacks subject matter jurisdiction because the constitutional claims are precluded by the CSRA (defined below). Defendants' challenge fails as a matter of law because Judge Tabaddor's constitutional claims fall outside the CSRA. Even if within the scope of the CSRA, because Judge Tabaddor's claims include discrimination, she has already complied with the applicable requirements of the CSRA, and all of her claims can now be heard in district court. Moreover, an independent jurisdictional basis for Judge Tabaddor's constitutional claims exists under 5 U.S.C. app. §404, which expressly grants judicial review, to any party aggrieved, of any statute or regulation arising under the federal conflict of interest laws.

Defendants also seek dismissal of Judge Tabaddor's discrimination claim for failure to timely exhaust administrative remedies. Defendants ignore that every discrete act of discrimination triggers its own clock for timely exhaustion. In like fashion, Defendants ignore that this Court can hear claims that are similar to or

---

[2] Even were this not the case, *arguendo*, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3).

reasonably related to Judge Tabaddor's administrative charge. Judge Tabaddor's EEO complaint alleged reprisal vis-à-vis new restrictions on her outside activities—a category in which her claim that Defendants wrongfully restricted her teaching activities falls.

Finally, Defendants assert that Judge Tabaddor did not adequately plead an adverse employment action with respect to her discrimination and reprisal claims. The recusal order is facially discriminatory, and the severity of such indefinite preclusion extends well beyond the eight cases involving Iranian nationals that were before Judge Tabaddor at the time the order was issued. Similarly, Defendants' challenge to the adequacy of Judge Tabaddor's reprisal claims fails under the applicable standard where her participation in outside activities has been attacked on more than one front since she first opposed Defendants' discriminatory conduct.

For all of these reasons, and as further discussed below, Defendants' Motion should be denied in its entirety.

## II.   STANDARD ON MOTION TO DISMISS

Defendants move to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), asserting (i) the Complaint does not sufficiently plead an adverse employment action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") as to Plaintiff's discrimination and retaliation causes of action, and (ii) does not sufficiently plead causation as to one aspect of Plaintiff's retaliation cause of action. When deciding a motion under Rule 12(b)(6), factual allegations in a complaint are taken as true and must be construed in the light most favorable to the non-moving party. *See Faulkner v. ADT Sec. Servs.,* 706 F.3d 1017, 1019 (9th Cir. 2013). To avoid dismissal, a complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Indeed, in the discrimination context, a plaintiff need not even plead a *prima facie* case in order to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (the shifting

burden framework is an evidentiary, not a pleading standard). As cited by Defendants, a court may consider "documents incorporated by reference in the complaint" when deciding a motion to dismiss. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Defendants also move to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction alleging (i) Plaintiff did not timely exhaust her administrative remedies vis-à-vis the regulatory provision for Equal Employment Opportunity ("EEO") counseling, (ii) one aspect of Plaintiff's retaliation claim was not raised in the administrative process; and (iii) Plaintiff's constitutional causes of action are precluded by the Civil Service Reform Act of 1978 ("CSRA"). As cited by Defendants, however, "[w]hether a plaintiff in a Title VII action has timely exhausted her administrative remedies is an affirmative defense, so the defendant bears the burden of pleading and proving it." *Kraus v. Presidio Trust Facilities Div.*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009) (internal citations and quotations omitted). The timely exhaustion of Title VII administrative remedies is not jurisdictional but instead, is a statutory requirement subject to waiver, estoppel and equitable tolling.[3] *See id.* at 1043; *Vivieratos v. U.S.*, 939 F.2d 762, 768 n.5 (9th Cir. 1991). Accordingly, Defendants' Motion with respect to exhaustion of Plaintiff's administrative remedies should be analyzed under Rule 12(b)(6), not Rule 12(b)(1). *See Taylor v. Blank,* 2014 WL 1577313, *4 (E.D. Cal. Apr. 17, 2014) (discussing *Kraus*); *see also Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (holding, in context of suit under Prison Litigation Reform Act, that non-jurisdictional exhaustion requirements must be raised either by a motion under Rule 12(b)(6) in the "rare event" that failure to exhaust is clear on the face of a complaint

---

[3] The Ninth Circuit has held that where a plaintiff has *not* filed any discrimination complaint with an administrative authority, the federal district court lacks subject matter jurisdiction. *Sommatino v. U.S.*, 255 F.3d 704, 709 (9th Cir. 2001). Defendants concede Plaintiff timely filed an administrative complaint and timely filed in this Court. [Mot., n.14.]

1  or by a motion for summary judgment).

2       Moreover, Defendants did not submit evidence in support of their Motion. A

3  challenge to subject matter jurisdiction may be either facial or factual. That is, "[a]

4  party who brings a Rule 12(b)(1) challenge may do so by referring to the face of the

5  pleadings or by presenting extrinsic evidence." *Lopez v. Trendacosta*, 2014 WL

6  6883945, *4 (C.D. Cal. Dec. 4, 2014) (citing *White v. Lee*, 277 F.3d 1214, 1242

7  (9th Cir. 2000)). Where, as here, Defendants have made a facial attack on

8  jurisdiction, the Court "must accept the allegations of the complaint as true." *Id.*;

9  *see also Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) ("The district

10  court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6):

11  Accepting the plaintiff's allegations as true and drawing all reasonable inferences in

12  the plaintiff's favor, the court determines whether the allegations are sufficient as a

13  legal matter to invoke the court's jurisdiction.").

14  **III.   FACTUAL BACKGROUND**

15       In the present procedural posture, the Complaint should be held to speak for

16  itself. Plaintiff believes it is important, however, to correct inaccuracies in the

17  Motion's characterizations of the allegations in the Complaint and its omission of

18  significant facts. Likewise, the Motion fails to cite relevant regulations and policies

19  of the United States Department of Justice ("Justice Department" or "Department of

20  Justice") and Executive Office for Immigration Review ("EOIR" or "Agency"),

21  which are therefore addressed here.

22      **A.   The Justice Department Affirmatively Encourages Employee Participation in Community Service and Civic Activities**

23

24       Appointed nearly a decade ago, Plaintiff is a sitting Immigration Judge on the

25  Los Angeles Immigration Court. [Compl., ¶19.] Judge Tabaddor's professional

26  career has been dedicated to work in the public arena. [*See id.*] Outside of the

27  courtroom,  Judge Tabaddor has engaged in a broad range of volunteer, academic,

28  bar-related and community engagement activities, some associated with the Iranian-

American community, but a majority not. [*Id.*, ¶¶28-30.] Judge Tabaddor's participation in outside volunteer and professional activities is well in line with Justice Department policy and always has been undertaken with appropriate ethics pre-approval. [*Id.*, ¶¶27, 29.] As referenced in the Complaint (¶27), a May 9, 2000 Memorandum by then Deputy Attorney General Holder provided that "Department employees are encouraged to participate in outside volunteer and professional activities, including pro bono and bar activities. …"[4] Even more, when Justice Department employees participate in outside organizations in their personal capacities, generally no approval is necessary. *Id.* In other words, long-standing Justice Department policy recognizes both the value and importance of public engagement outside of the workplace and as well, that participation in outside activities in an employee's personal capacity, in and of itself, does not implicate ethics concerns.

### B. Judge Tabaddor's Indefinite, Race and Nationality-Based Recusal Cannot Stand

#### 1. The Recusal Recommendation and Order

The events underlying the Complaint were triggered by an invitation from the White House Office of Public Engagement for Judge Tabaddor to attend, in her personal capacity and on her own behalf, a Roundtable with Iranian-American Community Leaders. [Compl., ¶31.] Defendants assert that Judge Tabaddor was told that *if* she chose to attend this event, she should recuse herself from matters involving individuals from Iran. [Mot., 1.] This is not accurate. When Judge Tabaddor sought approval from her supervisor Assistant Chief Immigration Judge ("ACIJ") Fong for use of annual leave to attend the event, ACIJ Fong forwarded Judge Tabaddor's request to the EOIR Office of General Counsel ("OGC") without

---

[4] *Available at* http://www.justice.gov/jmd/us-department-justice-0 (*last visited* Feb. 14, 2015).

her knowledge. [Compl., ¶31.] Judge Tabaddor did not, on her own volition, seek the opinion of the OGC, as she was simply requesting use of annual leave. [*Id.*]

Jeffrey Rosenblum, at that time Chief Counsel of the Employee/Labor Relations Unit in the EOIR OGC (*id.*, ¶23), provided ethics approval and confirmed ACIJ Fong's approval, by way of email on July 5, 2012, for Judge Tabaddor's attendance at the Roundtable. But, in the same email Mr. Rosenblum continued on to *sua sponte* "recommend" that based upon Judge Tabaddor's request to attend the event, and that she is active in the Iranian-American community, Judge Tabaddor disqualify herself from "any matter involving individuals from Iran that comes before [her] in [her] capacity as an Immigration Judge." [*Id.*, ¶33.] The only ground stated for the recommendation was 5 C.F.R. 2635.502(a). [*Id.*]

After attending the event, on August 20, 2012, Judge Tabaddor questioned the legal and factual adequacy of OGC's recommendation. She specifically asked if the recommendation was made because she is Iranian-American and whether she was being held to the same standard as other Immigration Judges. [*Id.,* ¶34.] Judge Tabaddor expressly queried why her civic and volunteer activities would create an appearance of bias and asked if she was being instructed to disqualify herself from all cases involving individuals from Iran. [*Id.*] On August 28, 2012, Mr. Rosenblum took his initial "recommend[ation]" further, stating that "OGC has *determined* that you *should* disqualify yourself from cases involving respondents from Iran to avoid any appearance problems." [*Id.*, ¶35 (emphasis added).] The recusal, now an order rather than a recommendation, was once again based upon 5 C.F.R. § 2635.502(a).[5]

---

[5] On its face 5 C.F.R. §2635.502(a) only allows for disqualification from "particular matters involving specific parties" and then, only when the "financial interest" of a member of an employee's household is effected or where parties with whom an employee has a "covered relationship" are involved. *Id.* Even if one of these two limited circumstances applies, disqualification is still only warranted if the employee determines there is a reasonable question of impartiality. *Id.* Section 2635.502(a) does not support the action taken here. [Compl., ¶¶61-64.] Admitting it is "largely irrelevant" at this point, Defendants nonetheless try to offer *post hac*

[*Id.*, ¶¶35-38.] Despite Judge Tabaddor asking for a specific explanation of how her outside activities could reasonably be viewed as creating an appearance of bias, the Agency made only generalized unsupported allegations that her association with the Iranian-American community was documented in the public domain as was her "advocacy." [*Id.*] The Agency conceded that Judge Tabaddor "in now way" has "an actual bias." [*Id.*, ¶36.] Judge Tabaddor protested her ordered recusal and sought review within the EOIR, which Mr. Rosenblum ultimately foreclosed. [*Id.*, ¶39-41.] ACIJ Fong then formalized the order against Judge Tabaddor by directing that she must comply with the OGC's recusal order. [*Id.*, ¶42.] ACIJ Fong did not perform any independent analysis, instead adopting the OGC's basis for the recusal recommendation and order and implementing the recusal order. [*Id.*, ¶¶42, 55.]

Defendants seek to minimize the action taken against Judge Tabaddor because, at the time the recusal order was issued, Judge Tabaddor had eight cases before her that included Iranian respondents and in which she was required, under protest, to issue orders disqualifying herself. [*Id.*, ¶43.] But, the recusal order is not limited to those eight cases; it is perpetual and still in effect today. [*Id.*, ¶44.] It is not enough to say, as Defendants do, that Judge Tabaddor gets assigned the same number of cases as other Immigration Judges where she has been and continues to be singled out and subjected to a separate case assignment and recusal standard. Defendants have impaired indefinitely Judge Tabaddor's judicial independence and

---

support for the recusal order with reference to the so-called "general provision" of section 2635.502(a)(2). [Mot., n.4.] For many reasons this is unavailing. Among them, section 2635.502(a)(2) applies to disqualification from "particular matters" a term which does not encompass blanket recusal based upon classifications of race or national origin. *See, e.g., Van Ee v. E.P.A.*, 202 F.3d 296, 303-304, 309-11 (D.C. Cir. 1999) (The phrase "particular matter" is limited to "particular, distinct, and identifiable sets of facts with reasonably measurable implications and consequences" and does not extend to the interests of a large and diverse group of persons). No reasonable person, acting in good faith, would deny that Iranian-Americans, in general, are a large and diverse group of persons.

authority as an Immigration Judge and impugned her reputation for impartiality—a fundamental aspect of the judiciary function.[6] [*Id.*, ¶45.]

### 2. The Agency Order was Issued in the Absence of Any Due Deliberation

The recusal order was not only wrong under the authority proffered by the Agency at the time it was issued (5 C.F.R. § 2635.502(a)), it was issued without any meaningful factual investigation, policy or legal review, use of a uniform process or consultation with required ethics personnel. Notably, in issuing the recusal recommendation and subsequent order, no one consulted with the Deputy Designated Agency Ethics Official ("DDAEO") at the time, Mr. JuanCarlos Hunt.[7]

Mr. Hunt has since stated under oath that he should have been consulted and that had he been, he would not have permitted such an order to be issued as it is

---

[6] This is no different than an order that would require an African-American Immigration Judge who was a member of an organization like the National Urban League or the National Bar Association and who participated in pro-bono and community service activities in connection with the same to be barred from hearing any cases involving individuals from Africa. [Compl., ¶64.] Such is not the effect that the federal conflict of interest statutes are intended to have. No matter the number of cases at issue, such an order (particularly if based on the results of an internet search of the person's name and "Africa[n]") would be immediately reviled as a most despicable form of racial profiling and discriminatory behavior. It has long been held that judges are not required "to repudiate their heritage in order to be impartial." *Com. of Pa. v. Local Union 542, Int'l. Union of Operating Eng'rs*, 388 F.Supp. 155, 181 (E.D. Pa. 1974).

[7] Defendants cite 5 C.F.R. §§2638.201 and 2638.301 for the proposition that "[c]ertain individuals within EOIR's OGC provide guidance and advice on applicable ethics regulations . . . ." [Mot., 7.] Section 2638.201 provides that every agency shall have a "designated agency ethics official" who is "to coordinate and manage the agency's ethics program" among other things.  Here, the relevant DDAEO, Mr. Hunt, was never so much as consulted. Section 2638.301 provides that the Director of the Office of Government Ethics ("OGE") has authority to issue formal advisory opinions. There was no formal advisory opinion by the OGE Director in this matter, nor was the Director consulted in the decision to recommend or order recusal. [*See* Compl., ¶¶40, 50, 53.]

inappropriate and discriminatory. [*See* Compl., ¶¶48-49.] Mr. Hunt also indicated under oath that he is not aware of any similar action being taken against an Immigration Judge at the time the recusal order was imposed upon Judge Tabaddor. [*Id.*]

Plaintiff additionally alleges that none of the following participated in or authorized the decision to order Judge Tabaddor's recusal: the Professional Responsibility Advisory Office, the Office of Professional Responsibility, the Director of EOIR, the General Counsel of EOIR, the Chief Immigration Judge or the Attorney General. [*See id.*, ¶53.] Indeed, the primary investigation undertaken by the officials responsible for Judge Tabaddor's blanket recusal was the *number* of results returned from one Google search using Judge Tabaddor's *misspelled* name and the word "Iran." [*Id.*, ¶¶51-52.] Not only is this direct evidence of the impermissible criteria utilized in ordering Judge Tabaddor's recusal—her race and national origin and association with the same—but it is also manifestly deficient. It does not support the conclusions reached by the Agency.[8] The Agency failed to undertake any meaningful scrutiny at all, much less of whether a compelling interest mandated imposition of a race and nationality based classification. The Agency's recusal order was uninformed, unanalyzed, and illegitimate.

Moreover, Judge Tabaddor sought confirmation from the Agency whether they were holding her to the same standard as other Immigration Judges. Judge

---

[8] Mr. Rosenblum's conduct infected even the exceedingly deficient consideration of this matter which was eventually undertaken after Judge Tabaddor protested the recusal recommendation. In consulting another OGC attorney, Mr. Rosenblum stated falsely that Judge Tabaddor was invited "*to speak* at a White House event about issues specific to the Iranian community." [Compl., ¶58 (emphasis added).] Judge Tabaddor was simply asking for use of leave to attend the Roundtable event. She was not invited to speak at the White House. Moreover, Mr. Rosenblum told this same attorney that the recusal matter "include[d] that the Immigration Judge (IJ) Tabaddor is Iranian." [*Id.*] Again, this demonstrates that the action taken against Judge Tabaddor was expressly based upon her race and national origin.

Tabaddor requested data from the Agency regarding any other case where an Immigration Judge had been subjected to blanket recusals as a result of being active in their ethnic and religious communities. [*Id.*, ¶34.] The Agency could not, however, cite any similar order having been issued in the past. Nor, apparently, did they evaluate any prior recusal determinations before taking action against Judge Tabaddor. [*See id.*, ¶54.] Furthermore, the Agency did not consider, and failed to comply with, the standards set forth in the policies and procedures specific to Immigration Judge recusals issued by the Office of the Chief Immigration Judge, among other things. [*See id.*, ¶66.]

### 3. The Agency's Retaliatory Conduct Following Judge Tabaddor's Challenge to her Recusal

The Agency has engaged in a pattern of retaliation aimed at Judge Tabaddor starting after she protested the July 5, 2012 recusal recommendation as being discriminatory and continuing after she instituted the Equal Employment Opportunity ("EEO") administrative process. [*Id.*, ¶¶33, 34, 70.] After challenging the July 2012 recusal recommendation, on August 28, 2012, the recusal recommendation was escalated to an order. [*Id.*, ¶¶35-42.] After Judge Tabaddor challenged the Agency's discriminatory conduct, she was thereafter subjected to new and broader restrictions in the use of her title in connection with virtually identical outside events where she had previously been approved for use of her title (with an appropriate disclaimer). [*Id.*, ¶¶71-72.] Similarly, after challenging the recusal, Judge Tabaddor was suddenly denied compensation for teaching immigration courses at the University of California Los Angeles ("UCLA") School of Law, although she previously had been allowed to receive compensation for teaching similar courses. [*Id.*, ¶73.]

The retaliatory nature of the Agency's restrictions upon Judge Tabaddor's outside speaking and teaching activities is borne out by the Agency policies that affirmatively encourage Immigration Judges' professional, academic and civic

1   activities outside of the workplace. Where the Justice Department affirmatively

2   elicits participation in such activities, and where Department policy does not

3   require preapproval for participation in outside activities in an employee's personal

4   capacity, approval to participate in such outside activities cannot be summarily

5   withdrawn or denied. Here, the Agency's sudden restriction on Judge Tabaddor's

6   participation in activities that are otherwise encouraged is in bad faith and

7   constitutes a reprisal.

8       In addition, the Agency's distortion of 5 C.F.R. §2635.502 chills the exercise

9   by all Immigration Judges of their rights of free speech and association outside of

10  the workplace. The threat that the Agency may deem an Immigration Judge to have

11  a "reasonable" appearance of bias because of their association with a particular

12  race, ethnicity and/or religion off the bench represents a serious threat to judicial

13  integrity and thus, deters free expression and association outside the workplace.

14  [*See id.*, ¶¶4, 11, 69, 75-76.] Moreover, after the Agency ordered Judge Tabaddor's

15  recusal, and after Judge Tabaddor began the EEO administrative process, the

16  Agency again sought to impose another similarly improper recusal order. [*Id.*, ¶69.]

17  In that instance, an Armenian-American Immigration Judge was invited to attend a

18  meeting with the United States Ambassador to Armenia. [*Id.*] In considering

19  approval for the request to attend, Mr. Rosenblum sought to impose a recusal as to

20  all cases involving individuals from Armenia. [*Id.*] Ultimately, no recusal

21  recommendation or order was issued. [*Id.*] Even though this later-occurring incident

22  does not change the fact that Judge Tabaddor has been singled out for adverse

23  treatment, it evidences the overbroad construction and application of 5 C.F.R.

24  §2635.502(a) and policy of enforcement in a manner that prospectively chills

25  speech. *Cf. Van Ee*, 202 F.3d at 310 (noting the "grave constitutional concerns" that

26  would arise if the conflict of interest statutes were construed to prohibit federal

27  employees' activities in connection with groups of which they were a member).

28

## IV.   JUDGE TABADDOR'S CONSTITUTIONAL CLAIMS CAN BE HEARD IN THIS COURT

Defendants move to dismiss Plaintiff's First and Second Causes of Action solely on grounds that they are precluded by the Civil Service Reform Act of 1978 ("CSRA"). Defendants recognize that the CSRA allows for causes of action under Title VII to be filed in federal district court. [Mot., n.8 (citing 5 U.S.C. §2302(d)).] Prior to filing her Complaint, Judge Tabaddor completed a lengthy administrative process under Title VII and properly filed her claims in this Court. [*See* Compl., ¶16.] Judge Tabaddor's Title VII causes of action assert that she was discriminated against because of her race, national origin and/or religion when she was forced to indefinitely recuse herself from all immigration cases involving individuals from Iran and that she was retaliated against for challenging the discrimination to which she continues to be subjected.

Defendants argue Plaintiff's constitutional claims allege only that Defendants' "direction" that Judge Tabaddor "recuse herself from a category of cases" in reliance on 5 C.F.R. §2635.502(a), *i.e.* the recusal order, violates the First Amendment. [Mot., 11.] Defendants assert the recusal order is a "personnel action" within the meaning of the CSRA. [*Id.*, 15.] Specifically, they argue the recusal order falls under the CSRA's catch-all provision within the definition of a personnel action for "any other significant change in duties, responsibilities or working conditions." [*Id.*, 15 (citing 5 U.S.C. §2302(a)(2)(xii)), 17 (citing *Mahoney v. Donovan*, 721 F.3d 633, 636 (D.C. Cir. 2013).[9]] Defendants then assert that where a personnel action is discriminatory and violates an employee's

---

[9] Defendants characterize *Mahoney* as "analogous." [Mot., 17.] But, *Mahoney* did not involve any constitutional claims or claims relating to protected conduct outside the workplace. Nor did it implicate 5 U.S.C. app. §404. Additionally, *Mahoney* was not a case involving a charge of discrimination. Moreover, the decision has been called into question by a recent Seventh Circuit decision. *See Assoc. of Administrative Law Judges v. Colvin*, 2015 WL 294267, *3 (7th Cir. Jan. 23, 2015).

constitutional rights, it is a "prohibited personnel practice" within the meaning of the CSRA. [*Id.*, 15.]

To the contrary, Judge Tabaddor's First and Second Causes of Action are *not* merely claims that the recusal order violates her First Amendment rights; Judge Tabaddor also claims that: (1) the Agency's rule that it can deem Immigration Judges to have an appearance of impropriety under 5 C.F.R. §2635.502(a) when they associate with racial, ethnic and/or religious groups outside of the workplace prospectively chills the First Amendment rights of all Immigration Judges; (2) the Agency's construction of 5 C.F.R. §2635.502(a) renders it overbroad and unconstitutionally vague and in derogation of the enabling statutes. These constitutional claims are not precluded by the CSRA.

## A.    Judge Tabaddor's Constitutional Claims are Outside the Scope of the CSRA

The constitutional causes of action stated in the Complaint are not within the bounds of the CSRA and therefore, are not preempted by it.

First, the CSRA defines a "prohibited personnel practice" by listing a series of actions that cannot be taken with respect to any "personnel action" as that term is defined by 5 U.S.C. §2302(a)(2)(A). The definition of a prohibited personnel practice begins: "Any employee *who has authority to* take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—. . . ." 5 U.S.C. §2302(b) (emphasis added). Here, whether the recusal order is a "personnel action" or not, none of the officials responsible for ordering Judge Tabaddor to recuse herself from all cases involving Iranians, principally Mr. Rosenblum of the OGC and ACIJ Fong, had the authority to make such an order. [*See* Compl., ¶¶22, 40, 42, 44, 48, 50, 53, 55, 66.] As such, there is no prohibited personnel practice at issue and the CSRA is not triggered.

Second, Judge Tabaddor's constitutional claims relate to the impermissible regulation and chilling of speech and association outside of the workplace.  Because

these claims can stand apart from a direct challenge to the recusal order imposed upon Judge Tabaddor if necessary, they are not preempted by the CSRA and may be brought in district court.

### 1. Immigration Judges are Required to Exercise Independent Judgment with Respect to the Cases that Come Before Them

Upon appointment, Immigration Judges take an oath to, among other things, uphold the Constitution and to "well and faithfully discharge the duties of the office of which" they are about to enter. 5 U.S.C. §3311. One such duty is to exercise judicial independence. This is not surprising given that the government appears as a party to immigration cases and it would raise questions if that same party were allowed to interfere in the adjudication of cases.

As Defendants cite, under Title 8 (Aliens and Nationality) of the United States Code, Immigration Judges are defined as attorneys appointed by the Attorney General as "administrative judges." [Mot., 5.] Being an attorney is a prerequisite to appointment as an Immigration Judge. *See Demjanjuk v. Mukasey*, 514 F.3d 616, 618-619 (6th Cir. 2008). While the term "administrative judge" (as distinct from administrative law judge) is not defined by statute or regulation, it refers to a judge who presides over executive agency proceedings. *See id.* Immigration Judges have authority to conduct a number of different types of immigration related proceedings, including exclusion, deportation, removal and asylum proceedings.

The regulations implementing Title 8 of the United States Code, which codifies the Immigration and Naturalization Act, make express provision for the judicial independence of Immigration Judges. Specifically, 8 C.F.R. §1003.10(b) states that "immigration judges *shall exercise their independent judgment and discretion* and may take any action consistent with their authorities under the [Immigration and Naturalization Act] and regulations that is appropriate and necessary for the disposition of such cases." (Emphasis added). The decisional independence of Immigration Judges is reinforced on the Office of Chief

Immigration Judge ("OCIJ") webpage cited by Defendants which explains that "[i]mmigration judges are responsible for conducting formal *court* proceedings and act *independently* in deciding the matters before them." [10] [http://www.justice.gov/eoir/ocijinfo.htm (emphasis added) (*lasted visited* February 14, 2015).] Immigration Judges' independent decision-making extends to recusal decisions. *See* 8 C.F.R. §1240.1(b) ("The immigration judge assigned to conduct the hearing shall at any time withdraw if *he or she deems himself or herself disqualified*.") (Emphasis added).

Moreover, cases are to be assigned to Immigration Judges on a random basis (within the dockets for the different types of cases over which an Immigration Judge may preside) and reassignments can only be imposed to ensure an efficient disposition of pending cases, not for substantive reasons. [*See* Compl., ¶44.] As provided in the implementing regulations relevant to the Immigration Courts, subject to the supervision of the Director of EOIR, the Chief Immigration Judge has the power "to regulate the assignment of immigration judges to cases" but only "to ensure the efficient disposition of all pending cases." 8 C.F.R. §1003.9(b)(3); *see also* 8 C.F.R. §1003.0(b)(ii) (substantially similar provision as to the Director of

---

[10] The same is reflected in the "Operating Policies and Procedures Memorandum 05-02: Procedures for Issuing Recusal Orders in Immigration Proceedings." [*See* Compl., ¶66; available at http://www.justice.gov/eoir/efoia/ocij/oppm05/05-02.pdf (*last visited* Feb. 14, 2015).] Immigration Judges are required to "examine and analyze each case *individually* to make a determination that disqualification is required" under a compelling evidence standard. *Id.*, 6. Moreover, issues of recusal are to be raised by a party in a particular case or by the presiding Immigration Judge. *See id.*, 1, 7. The "Ethics and Professionalism Guide for Immigration Judges" (Mot., 6) adds nothing of relevance and was not cited in the Complaint (Mot., n.3). In fact, it advises: "If an Immigration Judge disqualifies himself or herself from a case … he or she must … follow all the procedures delineated in OPPM 05-02, Procedures for Issuing Recusal Orders in Immigration Proceedings …." [Ethics Guide, 5.] Thus, the OCIJ policies referenced above, which recognize Immigrations Judges' authority to decide recusal matters on a case-by-case basis, apply to the very guidance Defendants try to proffer.

EOIR). The Chief Immigration Judge, thus, does not have authority to assign immigration cases, other than for workload balancing, based on non-substantive criteria. The regulations go further to specify that the "Chief Immigration Judge shall have no authority to direct the result of an adjudication assigned to another immigration judge. ..." 8 C.F.R. §1003.9(c); *see also* 8 C.F.R. §1003.0(d) (substantially similar provision as to the Director of EOIR).

No one responsible for forcing Judge Tabaddor's recusal had authority to require her to issue recusal orders under her name, but against her judgment. Likewise, no one responsible for causing Judge Tabaddor's recusal had the authority to impose limitations on all new cases to be assigned to Judge Tabaddor, based on the race and nationality of the respondent. No one responsible for causing Judge Tabaddor's recusal had the authority to divest her of her judicial independence in deciding whether to recuse herself from the cases before her.[11] Each of the foregoing exceeds the authority of the Chief Immigration Judge, who may only regulate the assignment of cases to ensure the efficient disposition of cases. Each of the foregoing results in the Chief Immigration Judge having impermissible influence over the result of an adjudication assigned to another immigration judge. The scope of the CSRA does not "extend[] beyond the applicability of the CSRA itself." *Gilding v. Carr*, 608 F.Supp.2d 1147, 1155 (D. Ariz. 2009). Where an action, even a personnel action, is taken by one without authority, there is no prohibited personnel practice within the meaning of the CSRA and there is no preemption. *Id.* at 1151-52.

---

[11] The recusal order was implemented by ACIJ Fong in reliance on 5 C.F.R. §2635.502(a), without considering the regulations particular to Immigration Judges. In any event, section 2635.502(a) provides for *the employee* to determine whether there is a question of impartiality. Defendants' *post hac* authorities are also unavailing. [Mot., 8:1 (citing §2635.106 (adressing disciplinary actions, not the application of ethics regulations in the first instance); 5 U.S.C. §7106 (reserves, but does not create, certain "management rights" in connection with collective bargaining )).]

### 2. Plaintiff's Constitutional Claims Involve Matters Outside of the Workplace

Judge Tabaddor's First Amendment claims additionally do not fall within the CSRA because they relate to conduct outside of the workplace. In *Keefe v. Library of Congress*, 588 F.Supp. 778 (D.D.C. 1984), an employee was found to have an appearance of bias resulting from attendance at a political convention outside of the workplace and on the employee's own time. *Id.* at 783. The employee asserted claims that the regulation upon which the appearance of bias finding was based was unconstitutionally vague and overbroad. *Id.* at 789. Relevant here, the court found that the CSRA did not preclude jurisdiction over the employee's First Amendment claim because it "arises from conduct taking place on the employee's own time away from the workplace." *Id.* at 787. The same applies here where Judge Tabaddor's First Amendment claims challenge the breadth and application of 5 C.F.R. §2635.502(a) in a manner that impermissibly deters protected First Amendment activity outside of the workplace. *Cf. Carter v. Kurzejeski*, 706 F.2d 835, 843 n.9 (8th Cir. 1983) ("[T]he district court might well have independent jurisdiction to review a claim by a federal employee discharged solely because that employee made a public speech expressing politically unpopular views away from the workplace."); *Ramirez v. U.S. Customs & Border Prots.*, 709 F.Supp.2d 74, 80 (D.D.C. 2010) (finding a decision not to authorize outside political activities does not fall within the definition of a "personnel action" under the CSRA).

In addition, the CSRA does not preclude claims challenging the constitutionality of regulations that restrict freedom of expression or association where an employee could bring his or her claims separately from challenging an action taken against them. *See Firenze v. NLRB*, 2013 WL 639151, *8 (D. Mass. Jan. 10, 2013) (The CSRA does not preclude "an independent claim arising under the Constitution"); *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996) (An employee is not precluded from bringing a First Amendment claim

"merely because she has also experienced a personnel action related to that claim."). Here, even if, *arguendo*, Judge Tabaddor could not challenge the constitutionality of 5 C.F.R. §2635.502(a) as applied to her (solely because of the CSRA as a jurisdictional impediment) she would still have standing to challenge 5 C.F.R. §2635.502(a) as chilling protected speech and association. *Cf. Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009) ("[A] plaintiff alleging that a statute is void for vagueness and overbreadth resulting in a chilling effect on speech has standing even if the law is constitutional as applied to him.").

## B.   Judicial Review of Conflict of Interest and Ethics Rules and Regulations was Specifically Provided for by Congress

Even if Judge Tabaddor's constitutional claims, in part or in full, do fall within the CSRA as Defendants argue, the claims still would not be precluded in this case.

Defendants depend on the Supreme Court's decision in *Elgin v. Department of the Treasury*, 132 S. Ct. 2126 (2012), to support the proposition that the CSRA precludes all constitutional claims arising out of federal employment.[12] [Mot., 13.] The holding is not so broad. In *Elgin*, the Supreme Court determined that petitioners could not challenge their termination from federal employment outside of the CSRA even if based on constitutional grounds. The petitioners in *Elgin* relied solely upon the general grant of federal question jurisdiction under 28 U.S.C. §1331 to argue they were entitled to bring constitutional claims in district court. *Id.* at 2132. In addition, the petitioners in *Elgin* were entitled as of right to an appeal to the Federal Circuit under the CSRA, which is not the case where, as here, a "prohibited personnel practice" as opposed to an "adverse action" is at issue. *Id.* at 2130. Because petitioners were entitled to judicial review under the CSRA, the

---

[12] Defendants additionally cite decisions in *United States v. Fausto,* 484 U.S. 439 (1988), and *Mangano v. United States*, 529 F.3d 1243 (9th Cir. 2008), but neither case was decided in the context of constitutional claims.

Supreme Court did not apply a heightened standard in evaluating Congressional intent to preclude constitutional claims by virtue of the CSRA. *Id.* at 2132. Instead, the Supreme Court evaluated whether it was "fairly discernible" that Congress intended to preclude district court jurisdiction over petitioners' constitutional claims and answered in the affirmative. *Id.* Here, three very important differences render *Elgin* inapplicable.

First, as pled in the Complaint, the Ethics in Government Act of 1978 (the same year the CSRA was enacted) expressly provides for ***judicial review*** of regulations relating to ethics and conflicts of interest such as 5 C.F.R. §2635.502.[13] Specifically, 5 U.S.C. app. §404 provides

> "[i]n promulgating rules and regulations pertaining to financial disclosure, conflict of interest, and ethics in the executive branch, the Director shall issue rules and regulations in accordance with chapter 5 of title 5, United States Code. ***Any person may seek judicial review of any such rule or regulation***." (emphasis added).

The Standards of Ethical Conduct for Employees of the Executive Branch (5 C.F.R. Part 2635) was enacted under the Ethics in Government Act. Thus, Judge Tabaddor's constitutional claims, which seek review of 5 C.F.R. 2635.502(a)—a regulation pertaining to conflict of interest and ethics in the Executive branch— were expressly carved out by Congress for judicial review. The legislative history of 5 U.S.C. app. § 404 shows that Congress specifically sought "***to give standing*** to 'any person' to seek judicial review" of rules and regulations within the scope of section 404. *See* H.R. CONF. REP. 95-1756 (1978) (available at 1978 WL 8586, *73) (emphasis added); *see also* S. REP. 95-170 (1977) (available at 1977 WL 9629, *146) (providing that the Director of the Office of Government Ethics "must develop procedures" whereby mistakes "can be resolved through a civil action.").

---

[13] Defendants should be foreclosed from raising any argument with respect to section 404 on reply. They were put on notice of the provision by the Complaint but failed to address it in their Motion.

It is also reasonable to infer that Congress knew what it was doing in granting judicial review under section 404 at the same time the CSRA was enacted. In this case, unlike in *Elgin*, it is not fairly discernable that Congress intended to preclude Judge Tabaddor's constitutional claims by virtue of the CSRA. The opposite is true in light of the express provision for judicial review under 5 U.S.C. app. §404.[14] No analogous provision was at issue in *Elgin*. Moreover, section 404 addresses a specific type of suit and so, does not result in a vast influx of cases brought in district court as opposed to falling under the CSRA.

Second, unlike in *Elgin* there is no "adverse action" at issue here. Here, Defendants have argued that Judge Tabaddor's claims raise a "prohibited personnel practice." In a recent case, a district court found it had jurisdiction over a claim that a prohibited personnel practice was unconstitutional. *Coleman v. Napolitano*, 2014 WL 4185190, *3-4 (D.D.C. Aug. 25, 2014). There, the government conceded, with reference to *Elgin*, that only adverse actions are entitled to review under the CSRA.[15] *Id.* at *3. But, the government argued that the plaintiff's constitutional claims should go unheard by an Article III Court, citing *Elgin*. The district court disagreed, explaining that *Elgin* was "inapposite" because in *Elgin* the employees at issue *did* have a right of judicial review because they were entitled as of right to an appeal to the Federal Circuit. *Id.* at *4. The district court explained that "the fact

---

[14] This analysis is not affected by 5 C.F.R. §2635.106(c) which precludes actions against the United States, its agencies, officers or employees for violating ethics or conflict of interest regulations. For example, a person cannot sue the government or its employees for violating conflict of interest provisions in connection with an administrative complaint against a university relating to admission practices. *See Scherer v. United States*, 241 F.Supp.2d 1270 (D. Kan. 2003). Judge Tabaddor has not brought a claim against any of the Defendants based upon their having an impermissible conflict of interest under 5 C.F.R. §2635.502.

[15] Even overlooking the government's position in *Coleman*, because Judge Tabaddor's claims involve discrimination, and the CSRA prohibits claim splitting as discussed below, Judge Tabaddor's constitutional claims cannot receive "meaningful review within the CSRA scheme."

that the 'petitioners' constitutional claims [could] receive meaningful review within the CSRA scheme' was essential to the Court's holding" in *Elgin* and the same is not present in the context of a prohibited personnel practice. *Id.* at *3 (quoting *Elgin*, 132 S.Ct. at 2139).

While *Elgin* applied the "fairly discernable" standard to analyze CSRA preclusion, the district court in *Coleman* determined that the heightened standard of *Webster v. Doe*, 486 U.S. 592 (1998) was applicable. *Id.* Because a "serious constitutional question would arise" if the CSRA were applied to preclude any judicial forum for a colorable constitutional claim, Congressional intent must be clearly stated to reach such a conclusion here. *Id.* The CSRA simply does not meet this "heightened showing." *Id.* at *4 (discussing *Davis v. Billington*, 2014 WL 2882679 (D.D.C. June 25, 2014).

Third, unlike in *Elgin*, Judge Tabaddor's case involves a charge of discrimination. Defendants' preclusion challenge amounts to an argument that Judge Tabaddor is allowed under the CSRA to pursue her discrimination claims through the administrative EEO process but was required to separately pursue any nondiscrimination claims relating to the *same matter* through some other procedure. By Defendants own description, the CSRA was designed to prevent precisely this type of inefficiency and multiplicity of suits. "[E]ven within the most intricate and complex systems, some things are plain. So it is in this case, where … the CSRA, read naturally, direct[s] employees like [Judge Tabaddor] to district court." *Kloeckner v. Solis*, 133 S.Ct. 596, 603 (2012).

As Defendants cite, 5 U.S.C. §7121(a)(1) provides, in relevant part, that

> [A]ny collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. *Except as provided in subsections (d)*, (e), and (g) of this section, the procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage. (Emphasis added)

Defendants allege, and Plaintiff does not dispute, that Immigration Judges are unionized, that Judge Tabaddor is a member of the union, and that the recusal order

would fall within the scope of the relevant collective bargaining agreement addressed under 5 U.S.C. §7121. [Mot., 4-5 & n. 9.] Judge Tabaddor did not raise the matter of the recusal recommendation or order under a negotiated grievance procedure. But, because Judge Tabaddor's case involves discrimination, she was not required to do so by virtue of 5 U.S.C. §7121(d). Section 7121(d) states, in relevant part (emphasis added):

> An aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of this title which also falls under the coverage of the negotiated grievance procedure *may raise the matter under a statutory procedure* **or** *the negotiated procedure,* **but not both***.*

Section 2302(b)(1) relates to prohibited personnel practices involving claims of discrimination. The word "matter" in section 7121(d) refers broadly to the underlying employment actions at issue in the dispute, not to a plaintiff's discrimination claim. *See Macy v. Dalton*, 853 F.Supp. 350, 353 (E.D. Cal. 1994); *Santos-Reyes v. Gonzales*, 2007 WL 988182, *4 (N.D. Cal. Apr. 2, 2007).

Here, Judge Tabaddor was not allowed, thus cannot be required, to split her discrimination claims and nondiscrimination claims relating to the same matter. "The CSRA does not countenance the dividing of proceedings according to legal theory." *Santos-Reyes*, 2007 WL 988182, at *4. "Advancing claims over the same matter in two separate forums is precisely the type of fragmentation that Congress aimed to prohibit when enacting the CSRA." *Id.* at *5; *see also Macy*, 853 F.Supp. at 354 ("The regulation reflects Congress' preference for election of a single remedy and the policy of avoiding claim splitting.").

Judge Tabaddor properly raised the matter of the recusal recommendation and order "under a statutory procedure"—the EEO procedure—and that is all she was required to do in order to bring all of her claims relating to the same matter in district court. *See Moreno v. McHugh*, 2011 WL 2791240, *9 (D. Md. July 14, 2011) ("In sum, an employee covered by a collective bargaining agreement with an applicable grievance process may elect one of two options, but not both: (1) she

may file a grievance pursuant to her union's negotiated grievance; or (2) she may make a statutory election, by filing a formal EEO complaint or, in certain cases, a claim with the MSPB. Notably, the employee … may not pursue both remedies.") (citing *Vivieratos v. U.S. Dep't of Air Force*, 939 F.2d 762, 768 (9th Cir. 1991)). Defendants offer no reason to presume that despite the purpose of the CSRA, and the express provisions of 7121(d), Congress intended to require employees like Plaintiff to bifurcate claims rooted in the same underlying facts.

## V.   JUDGE TABADDOR'S CLAIMS UNDER TITLE VII ARE NOT SUBJECT TO DISMISSAL

### A.   Judge Tabaddor has Stated a Claim for Discrimination

#### 1.   Judge Tabaddor Contacted an EEO Counselor Within 45 Days of the Discriminatory Employment Action

Defendants argue that Judge Tabaddor failed to exhaust her discrimination claim because she "did not initiate contact with an EEO counselor for more than three months, well outside the 45-day period mandated by regulation." [Mot., 19.] This argument portrays Defendants' fundamental mischaracterization of the nature of Judge Tabaddor's claims and the requirements of Title VII. Defendants treat two discrete acts—an OGC recommendation, and an OGC directive which became an order from Judge Tabaddor's supervisor—as if they were one. Each of these acts was discriminatory in its own right, and the second act (the directive and order) is the basis for Judge Tabaddor's discrimination claim.

"A discrete act of discrimination is an act that in itself constitutes a separate actionable 'unlawful employment practice' and that is temporally distinct." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2175 (2007). Judge Tabaddor alleges two discrete acts. First, on July 5, 2012, OGC "*recommend[ed]* that [Judge Tabaddor] disqualify [her]self from any matter involving individuals from Iran." [Compl., ¶ 33 (emphasis added).] Although Plaintiff did not contact a counselor within 45 days of this discriminatory act, such does not preclude Judge Tabaddor from bringing her discrimination claim for later,

1   related acts. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)

2   ("The existence of past acts and the employee's prior knowledge of their

3   occurrence, however, does not bar employees from filing charges about related

4   discrete acts so long as the acts are independently discriminatory and charges

5   addressing those acts are themselves timely filed.") Rather, prior acts are relevant

6   as background evidence. *Id.* ("Nor does the statute bar an employee from using the

7   prior acts as background evidence in support of a timely claim.").

8        Second, on August 28, 2012, OCG directed Judge Tabaddor to recuse

9   herself: "OCG has *determined* that you *should* disqualify yourself." [Compl. ¶35

10   (emphasis added).] OGC itself acknowledged that this was a discrete act with new

11   consequences, as the July 5th recommendation was merely a suggestion. [*See id*.]

12   This is further borne out by the fact that on September 10, 2012, Judge Tabaddor's

13   supervisor adopted and enforced OGC's directive and ordered Judge Tabaddor to

14   recuse herself from all cases involving individuals from Iran.[16] [*See* Compl., ¶¶42,

15   55.] As a result, not only was Judge Tabaddor forced, under protest, to issue recusal

16   orders in eight cases then before her involving individuals from Iran, but the recusal

17   order was implemented after ACIJ Fong's adoption of OGC's order and continues

18   to be enforced to date. Judge Tabaddor is no longer randomly assigned cases, and

19   _____

20   [16] Defendants dispute as a matter of fact whether ACIJ Fong had "discriminatory

21   animus" in adopting and enforcing the OGC's facially discriminatory recusal order.
     [Mot., n. 16.] Although Defendants' factual disputes are improper in the context of

22   this Motion, Plaintiff notes that the conduct and motives of those who were
     involved in the decision, including Mr. Rosenblum, is imputed to ACIJ Fong.  *See*

23   *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1141 (9th

24   Cir. 2001); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th

25   Cir. 2000) (explaining with reference to intentional discrimination that formal
     authority is not determinative, rather courts "look to who actually made the decision

26   or caused the decision to be made, not simply to who officially made the
     decision."). This is particularly so where ACIJ Fong did not undertake any

27   independent investigation or analysis and instead, adopted the OGC's position and

28   implemented the order. [*See* Compl., ¶55.]

no longer has complete authority to decide whether to recuse herself from any given case, in contrast to other Immigration Judges. [*Id.*, ¶¶44-45.] This was a facially discriminatory act, as Judge Tabaddor's case assignments were henceforth based on race and/or national origin.

"Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113. Accordingly, when Defendants elevated OGC's recommendation into a directive and order—forcing Judge Tabaddor in September 2012 to recuse herself from existing cases involving Iranian nationals and altering the manner in which cases are assigned to her—a new clock started for Judge Tabaddor to contest the new action. Defendants admit that Judge Tabaddor contacted an EEO counselor within 45 days of this second discriminatory act. [*See* Mot., 19 ("If August 28 were indeed the operative date, plaintiff's contact with an EEO counselor would have fallen just inside the 45-day window.").] Because Judge Tabaddor bases her Title VII discrimination claim on acts within the applicable counseling time frame, her claim was properly exhausted.

### 2. The Government's Racial Discrimination Constitutes an Adverse Employment Action

Although Defendants subjected Judge Tabaddor to a system in which her case assignments are based upon racial, national origin, and/or religious classifications, they argue that she was not "subject to an adverse employment action." [Mot., 22.] Instead, Defendants suggest that the discriminatory assignment system uniquely applied to Judge Tabaddor is merely a non-actionable "minor 'readjustment of [her] job assignments.'" [Mot., 23.] This argument is controverted by Defendants' position that the CSRA precludes Judge Tabaddor's constitutional claims precisely because the recusal order constitutes a "*significant change* in duties, responsibilities or working conditions" (emphasis added) such that the CSRA is triggered. Although Defendants are wrong about the nature of Judge Tabaddor's constitutional claims and the application of the CSRA, as discussed

above, the contradictory characterizations of the recusal order offered by Defendants undermine their bid to convince the Court, at the motion to dismiss stage, that Judge Tabaddor has not adequately pled her Title VII claim.

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). "[T]his not only covers 'terms' and 'conditions' in the narrow sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment … in employment.'" *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Indeed, the Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition 'is not limited to "economic" or "tangible" discrimination." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115-16. In accord, the Ninth Circuit has "define[d] 'adverse employment action' broadly." *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (noting that a warning letter or a negative review could constitute an adverse employment action).

The facially discriminatory system of recusal and case assignments that Defendants imposed on Judge Tabaddor affects the conditions and privileges of her employment, and constitutes an adverse employment action.[17] By forcing Judge

---

[17] Defendants argue Plaintiff has not adequately pled discrimination on account of her religion because many of Plaintiff's factual allegations relate to race and national origin. [Mot., n.18.] As alleged, the recusal order was expressly issued because of Judge Tabaddor's race and national origin and association with others sharing those characteristics. This constitutes direct evidence of discrimination. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). Direct evidence is sufficient, but not necessary, for a *prima facie* case. *Id.* As it relates to Plaintiff's claim of religious discrimination, all Plaintiff is required to allege are facts plausibly supporting that (i) she belongs to a protected class (¶20); (ii) she is qualified for and performing her position (¶19); (iii) she was subject to an adverse employment action (*see* ¶¶35-46); and (iv) similarly situated individuals outside her

Tabaddor to recuse herself from cases involving Iranian nationals, and no longer assigning her such cases, Defendant have significantly impaired Judge Tabaddor's judicial authority on an ongoing basis and continue to improperly imply that she is less capable than her peers of performing her job with integrity, and thereby stigmatize her. It runs contrary to the Complaint and common sense to assert that other than the eight cases from which Judge Tabaddor was required to recuse herself, "[i]n all other respects, her employment remains unchanged." [Mot., 22.] In other legal contexts, the Supreme Court has condemned such actions and "pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

For example, the Supreme Court has found that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [her]," the resulting harm is sufficient to invoke Due Process protections. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Judge Tabaddor should receive the same consideration under Title VII.

In essence, the Government promotes a system of "separate but equal" and claims that it has no adverse effects. But 60 years of case law tell us differently. *See generally Brown v. Board of Educ.*, 347 U.S. 483 (1954); *see also Deweese v. Cascade Gen. Shipyard*, 2011 WL 3298421, at *11 (D. Or. May 9, 2011) (finding that segregation of employees, even if performing the same tasks, can constitute an adverse employment action "because of the stigma that it would imply.") (citing *Brown*). This Court should not countenance Defendants' improper system of discrimination and stigmatization, which is a far cry from the "purely subjective" injury Defendants paint it to be, and it should deny Defendants' motion to dismiss.

---

protected class were treated more favorably (*see* ¶54). *See Vasquez*, 349 F.3d at 640 n. 5. The Complaint adequately alleges discrimination based on religion.

### B. Judge Tabaddor States a Claim for Retaliation

Judge Tabaddor alleges three retaliation claims. First, Defendants improperly restricted her use of her title at outside speaking engagements. Before Judge Tabaddor protested the government's discriminatory actions against her, Defendants had not imposed such restrictions for functionally identical speaking engagements. Second, after Judge Tabaddor disputed OGC's discriminatory recommendation to recuse, Defendants retaliated by forcing her to recuse. Third, Defendants denied Judge Tabaddor her ability to be compensated for teaching an immigration law course at UCLA School of Law and continue to do so. This too was different from how Defendants treated Judge Tabaddor before she filed her discrimination claims. None of Defendants' arguments against these claims is persuasive.

### 1. Judge Tabaddor's Teaching Claim Is Exhausted Because It Is "Like or Reasonably Related to" Her Other Claims

Defendants first argue that Judge Tabaddor failed to exhaust her teaching claim because it was not "included in her EEO charge." [Mot., 25.] But claims that are "like or reasonably related to the allegations of the EEOC charge" need not be explicitly stated in the EEO charge. *Ouchibon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973).

Judge Tabaddor's teaching claim is "like or reasonably related to" the retaliation charges asserted in her EEO charge.  The charge asserts that:

> [B]ecause Judge Tabaddor protested [Defendants'] discriminatory treatment of her, [Defendants] have subjected her to further adverse acts and threats of reprisals . . . including: (1) holding her to more restrictive standards with respect to her ability to engage in outside activities, and (2) threatening her that there are "consequences" to her participating in outside activities, and carrying out that threat by restricting her ability to participate in activities that she had been allowed to participate in before she protested Respondents' discriminatory recusal order.

> [Complaint of Discrimination, at 10 (referenced in Compl., ¶16.c).]

Judge Tabaddor's teaching claim falls squarely within this description. The

opportunity to teach immigration law courses at UCLA is obviously one of Judge Tabaddor's "outside activities." After Judge Tabaddor complained of discrimination, Defendants "restrict[ed] her ability to participate" in the activity—by denying her the ability to be paid for it. Finally, before Judge Tabaddor complained about discrimination, she had been allowed to participate in the outside activity without the added restrictions.

Next, the government argues (without any reference to the record) that "the relevant ethics opinion was issued almost a year after the events that gave rise to this case." [Mot., 26.] This makes no difference because the action was taken while the EEO investigation was still pending. When an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC. *Ouchibon*, 482 F.2d at 571 (emphasis added) (citing cases). Indeed, the Ninth Circuit has held that to find otherwise would be a waste of resources: "To force an employee to return to the [agency] every time [s]he claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier." *Id.*

## 2. Defendants Committed Retaliatory Adverse Actions Against Judge Tabaddor

Defendants challenge whether two of Judge Tabaddor's retaliation claims allege an "adverse action." In the retaliation context, an adverse action is one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This is a lesser standard than the standard for finding an "adverse employment action" in the discrimination context. *See Markoff v. Superior Court*, 2014 U.S. Dist. LEXIS 87331, at *25 (E.D. Cal. June 25, 2014). Indeed, "[t]o

constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). Judge Tabaddor's allegations meet this standard.

First, Defendants argue that when Judge Tabaddor received OGC's directive and her supervisor's order to recuse, "this action caused plaintiff no 'injury or harm.'" [Mot., 27.] For all the reasons that this action constitutes an adverse employment action (*see* Section V.A.2, above), it also constitutes retaliation.[18] Indeed, as Defendants admit (Mot. 27, n.19), the standard for an adverse action in the retaliation context is lower than in the discrimination context.

Second, Defendants argue that Judge Tabaddor's "allegation that she was prevented from using her title (with an appropriate disclaimer) when attending outside speaking engagements … does not rise to the level of an adverse action." [Mot., 28.] As alleged in the Complaint, however, Judges—including Immigration Judges—"routinely speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, the administration of justice and a range of other matters of public concern." [Compl., ¶ 2.] Many of these opportunities arise in large measure because the Judges are Judges, and instantly garner respect from the legal community at large. To deny Judge Tabaddor the use of her title (with appropriate disclaimer) undercuts her ability to participate in these activities, which

---

[18] Plaintiff can plead a claim of retaliation and claim of discrimination based on the same act. *See Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F.Supp.2d 404, 421 n.6 (W.D.N.Y. 2008); *see also Bragg v. Office of the Dist. Attorney*, 704 F.Supp.2d 1032, 1063 (D. Colo. 2009). Although Plaintiff did not timely seek EEO counseling as to the July 5, 2012 recusal recommendation, she can still state a claim for retaliation based on the Agency's escalation of the recusal recommendation to an order after she protested the recommendation as discriminatory. *See, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) ("To establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed."). Defendants do not dispute that this retaliation claim was timely exhausted.

is in direct conflict with Justice Department policy. [*See* Compl., ¶ 27.] A reasonable judge in the same position would feel the same about the action, and "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.

### 3. Judge Tabaddor Alleges a Causal Link for Her Teaching Claim

Defendants argue that Judge Tabaddor has not alleged a sufficient causal link between her discrimination complaint and Defendants' retaliatory denial of her ability to receive compensation for teaching at UCLA School of Law, apparently because Judge Tabaddor "does not say how soon after the events that gave rise this case" it happened. [Mot., 29.] The law, however, does not require any specific temporal proximity for a retaliation claim, nor does it require detailed pleadings of causation.[19]

Judge Tabaddor adequately alleges a causal link. In the past, Judge Tabaddor had been permitted to receive compensation for teaching immigration law courses at UCLA School of law. After she complained about Defendants discriminatory acts, however, the same permission was denied. There are no other significant intervening events to explain Defendants' changed position—there was no Justice Department policy change, no substantial change to the nature of the course. It is certainly a plausible explanation—if not the only possible explanation—that Defendants changed their position as retaliation for Judge Tabaddor's protected activity.

In addition, the causal link for Judge Tabaddor's teaching claim is strengthened by her other allegations. Judge Tabaddor alleges that Defendants' chosen method of retaliation was placing new restrictions on Judge Tabaddor's

---

[19] Defendants' factual allegation that Plaintiff was denied compensation "almost a year after the events that gave rise this case" is improper at this juncture and where Defendants presented no evidence in support of the Motion. [Mot., 26, 30.]

outside activities, whether those are speaking engagements or teaching opportunities. The consistency of Defendants' retaliatory actions further suggests that the teaching claim is causally connected to Judge Tabaddor's protected activity.

Finally, it does not matter that the retaliation did not occur immediately. At the next available teaching opportunity after Judge Tabaddor's EEO complaint, Defendants denied her permission to receive compensation. To find that she has not sufficiently alleged causation would effectively punish Judge Tabaddor for something out of her control: the natural timing for the teaching opportunities she receives.

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.[20]

Respectfully submitted,

Dated:       February 23, 2015       COOLEY LLP


                                     /s/ Ali M.M. Mojdehi
                                     Ali M. M. Mojdehi (123846)

                                     Attorneys for Plaintiff
                                     Immigration Judge A. Ashley Tabaddor

---

[20] Should the Court determine to grant the Motion in whole or in part, Plaintiff requests leave to amend. *Tatung Co. v. Shu Tze Hsu*, 2014 WL 4306561, at *16 (C.D. Cal. Sept. 2, 2014) ("Generally, leave to amend a pleading 'shall be freely given when justice so requires'…. This policy is applied with 'extreme liberality.'") (Internal citations omitted).