1  Manatt, Phelps & Phillips, LLP
   CARL L. GRUMER (Bar No. CA 066045)
2  E-mail: cgrumer@manatt.com
   11355 West Olympic Boulevard
3  Los Angeles, CA 90064-1614
   Telephone: (310) 312-4000
4  Facsimile: (310) 312-4224

5  Attorneys for *Amici Curiae* Arab American
   Lawyers Association of Southern California, Asian
6  Americans Advancing Justice, Asian Pacific
   American Bar Association of Los Angeles County,
7  Asian Pacific American Women Lawyers Alliance,
   The Iranian American Bar Association, Korean
8  American Bar Association of Southern California,
   Mexican American Bar Association of Los Angeles
9  County, National Asian Pacific American Bar
   Association, Philippine American Bar Association,
10 South Asian Bar Association of Northern
   California, South Asian Bar Association of
11 Southern California, Southern California Chinese
   Lawyers Association, and Thai American Bar
12 Association

13

14                    UNITED STATES DISTRICT COURT

15                    CENTRAL DISTRICT OF CALIFORNIA

16

17  AFSANEH ASHLEY TABADDOR,            No. 14-cv-06309 GW (cw)

18              Plaintiff,             BRIEF OF AMICI CURIAE IN
                                       OPPOSITION TO MOTION TO
19       vs.                           DISMISS

20  ERIC H. HOLDER, JR., Attorney      Date:   April 23, 2015
    General of the United States, United Time:   8:30 a.m.
21  States Department of Justice;       Place:  Courtroom of the Honorable
    JEFFREY A. ROSENBLUM; General              George Wu
22  Counsel, Executive Office for
    Immigration Review; THOMAS Y.K.
23  FONG, Assistant Chief Immigration
    Judge, Executive Office for
24  Immigration Review; MARLENE M.
    WAHOWIAK, Associate General
25  Counsel, Office of the General
    Counsel, Executive Office for
26  Immigration Review; UNITED
    STATES DEPARTMENT OF
27  JUSTICE; EXECUTIVE OFFICE FOR
    IMMIGRATION REVIEW, UNITED
28  STATES DEPARTMENT OF
    JUSTICE; OFFICE OF THE

**FILED**
CLERK, U.S. DISTRICT COURT

February 25, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JG ____ DEPUTY

1  GENERAL COUNSEL, EXECUTIVE
   OFFICE FOR IMMIGRATION
2  REVIEW; OFFICE OF THE CHIEF
   IMMIGRATION JUDGE,
3  EXECUTIVE OFFICE FOR
   IMMIGRATION REVIEW,
4
                Defendants.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ....................................................................1

INTRODUCTION.........................................................................................1

STATEMENT OF FACTS RELEVANT TO THIS BRIEF ........................2

I.     THE FEDERAL COURTS HAVE REJECTED ATTEMPTS TO DISQUALIFY JUDGES BASED UPON SIMILAR GROUNDS. A FEDERAL AGENCY SHOULD NOT ACCOMPLISH BY EXECUTIVE FIAT WHAT THE COURTS HAVE UNIFORMLY PROHIBITED..........................................................................................4

II.     THE GOVERNMENT'S CONDUCT IN THIS CASE ADVERSELY AFFECTS JUDGES FROM PARTICULAR ETHNIC AND RELIGIOUS GROUPS AND JUDGES FROM OTHER AFFINITY GROUPS, AS WELL AS THOSE ASPIRING TO BECOME JUDGES..........................................................................................6

III.    PLAINTIFF HAS ALLEGED AN ADVERSE EMPLOYMENT ACTION. ...........................................................................................8

CONCLUSION ..........................................................................................10

# TABLE OF AUTHORITIES

**Page**

## CASES

*Blank v. Sullivan & Cromwell,*
  48 F. Supp. 1 (S.D.N.Y. 1975) ......................................................................4, 5

*Bryce v. Episcopal Church in the Diocese of Colorado,*
  289 F. 3d 648 (10th Cir. 2002).......................................................................4

*Commonwealth of Pennsylvania v. Local Union 542,*
  388 F. Supp. 155 (E.D. Pennsylvania 1974)...................................................4, 5

*Ebay, Inc. v. Mercexchange,*
  LLC 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed. 2d 641 (2006) ...........................2

*Feminist Women's Health Center v. Codispoti,*
  69 F. 3d 399 (9th Cir. 1995)...........................................................................4

*Hollingsworth v. Perry,*
  __ U.S. __, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013)......................................5

*Home Placement Service v. Providence Journal Co.,*
  739 F. 2d 671 (1st Cir. 1984).........................................................................7

*Idaho v. Freeman,*
  507 F. Supp. 706 (D. Idaho 1981) ..................................................................5

*In re Evans,*
  801 F. 2d 703 (4th Cir. 1986) ........................................................................5

*MacDraw, Inc. v. CIT Group,*
  138 F. 3d 33 (2d Cir. 1998)...........................................................................5, 9

*Menorah v. Illinois High School Association,*
  527 F. Supp. 632 (N.D. Illinois 1981) ............................................................4

*Murray v. Scott,*
  253 F. 3d 1308 (11th Cir. 2001) ....................................................................7

*Paschall v. Mayone,*
  454 F. Supp. 1289 (S.D.N.Y. 1978) ...............................................................4, 5

*Perry v. Schwarzenegger,*
  790 F. Supp. 2d 1119 (N.D. California 2011), affirmed, 671 F.3d
  1052 (9th Cir. 2012)......................................................................................5

*Republican Party of Minnesota v. White,*
  536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002)................................6

# TABLE OF AUTHORITIES
## (continued)

Page

*Singer v. Talbot*,
745 F. 2d 606 (10th Cir. 1984) ...................................................................5

*United States v. Alabama*
828 F. 2d 1532 (11th Cir. 1987) .........................................................4, 5, 7

*United States v. El-Gabrowny*,
844 F. Supp. 955 (S.D.N.Y. 1994) ...........................................................5

*United States v. Nelson*,
2010 U.S. Dist. *Lexis* 63814 (E.D.N.Y. 2010) ...............................4, 5, 6, 9

*Vietnamese Fisherman's Association v. Knight of the Ku Klux Klan*,
518 F. Supp. 1017 (S.D. Texas 1981)........................................................5

## STATUTES

28 U.S.C. § 144 ..............................................................................................4

28 U.S.C. § 455 ..............................................................................................4

## OTHER AUTHORITIES

5 C.F.R. § 2635.502(a).....................................................................................4

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

BRIEF OF AMICI CURIAE

1    Amici Curiae Arab American Lawyers Association of Southern

2    California, Asian Americans Advancing Justice, Asian Pacific American Bar

3    Association of Los Angeles County, Asian Pacific American Women Lawyers

4    Alliance, The Iranian American Bar Association, Korean American Bar Association

5    of Southern California, Mexican American Bar Association of Los Angeles County,

6    National Asian Pacific American Bar Association, Philippine American Bar

7    Association, South Asian Bar Association of Northern California, South Asian Bar

8    Association of Southern California, Southern California Chinese Lawyers

9    Association, and Thai American Bar Association respectfully request the Court to

10   consider the following Brief in Opposition to the Motion of the Defendants to

11   Dismiss the First Amended Complaint herein:

12                               **STATEMENT OF INTEREST**

13           The Statements of Interest of Amici are set forth in Appendix 1 hereto.

14   Because of the importance of this case to the communities they serve and the

15   groups they work closely with, Amici submit the following Amicus Curiae Brief, so

16   that the views of the affected community can be considered by the Court.[1]

17                                  **INTRODUCTION**

18           Amici submit this brief because the outcome of this case will have far-

19   reaching impact not only on judges of particular ethnic backgrounds everywhere,

20   but also on attorneys who are members of any affinity group who may aspire to

21   become judges.  The actions of the defendants as alleged in the Amended

22   Complaint, if allowed to stand unredressed, would threaten the careers of present,

23   future, and aspiring judges who are members of any affinity group, whether racial,

24   ethnic, religious, LGBTQ or otherwise.  Particularly for lawyers aspiring to be

25   judges, defendants' recusal policy discourages their involvement in affinity groups

26

27   [1] The majority of the issues raised in the Motion to Dismiss do not raise issues which are appropriately addressed by Amici (e.g., failure to exhaust administrative remedies, scope of the Civil Service Reform Act).  While Amici do not

28   concede the merits of those issues, they will not be addressed here, and discussion is left up to the parties.  This Brief will rather focus on the issues of specific relevance to the Amici.

1  such as ethnic bar associations, where they can develop the prominence necessary

2  to be considered for a place on the bench.  That policy is a big step backwards

3  towards efforts to diversify the bench, potentially resulting in a judiciary that is less

4  reflective of the increasingly diverse population it serves.  The practices alleged

5  here, resulting in the *de facto* recusal of an Iranian-American judge based upon her

6  ethnicity, have been uniformly rejected when attempted by private litigants. The

7  fact that this appears to be the implementation of a policy by a federal agency only

8  serves to cause greater alarm.

9         Amici submit this Brief in support of the plaintiff, and in opposition to

10  the defendants' pending Motion to Dismiss.  As shown below, the Amended

11  Complaint does state valid claims for relief.  The actions of the defendants were

12  entirely unjustified and clearly constitute not only unlawful discrimination, but also

13  an unconstitutional infringement upon the plaintiff's First Amendment rights of

14  freedom of speech and association.  This infringement would not have occurred but

15  for her ethnic background.

16         These considerations are directly relevant to the complaint at issue

17  here.  The First Amended Complaint includes claims for injunctive relief.  Under

18  controlling Supreme Court authority, one of the factors in determining whether to

19  grant injunctive relief is whether the requested injunction would be in the public

20  interest.  *Ebay, Inc. v. Mercexchange*, LLC 547 U.S. 388, 126 S.Ct. 1837, 164

21  L.Ed. 2d 641 (2006).  For the reasons discussed below, the public interest would

22  clearly be served by the requested injunctions.

23  <u>**STATEMENT OF FACTS RELEVANT TO THIS BRIEF**</u>

24         Since this is a Motion to Dismiss, the universe of relevant facts is

25  contained in the Amended Complaint.  The following facts as alleged therein are

26  relevant to the position asserted by Amici in support of the plaintiff. All references

27  below are to the Amended Complaint, filed herein on October 3, 2014 (Docket No.

28  45).

1         Plaintiff is an immigration judge with the United States Department of

2  Justice, Executive Office for Immigration Review. ¶1. Plaintiff was born in the

3  country of Iran and is a first generation Iranian American. ¶21. After having sat

4  without incident as an immigration judge for seven years, in 2012 plaintiff was

5  ordered by defendants to recuse herself from all pending cases before her involving

6  individuals from Iran. ¶42. Defendants' stated basis for that order was plaintiff's

7  involvement in the Iranian-American community, including speaking engagements,

8  presentations, and "advocacy," and because she was a prominent figure in the

9  Iranian-American community and was an "advocate/activist" for that group. ¶¶35

10  and 51. There are no allegations of actual bias or any specific improper conduct on

11  the part of the plaintiff. ¶36. No litigant sought to disqualify her for bias.

12         Defendants' recusal order was a categorical recusal, not on a case by

13  case basis or with regard to the specific facts or circumstances of a particular case.

14  ¶¶42-43. Since that time, plaintiff has remained disqualified from presiding over

15  any cases involving Iranian nationals and to this day has not been assigned a single

16  such case. ¶44.

17         Based upon these facts, it is clear that plaintiff has been disqualified

18  from handling cases involving Iranian nationals based solely upon her ethnicity and

19  involvement in the Iranian-American community. Such discrimination based upon

20  national origin and the exercise of First Amendment rights does not comport with

21  federal anti-discrimination laws and the United States constitution and should not

22  be allowed to stand. The existence of such policies and practices by a

23  governmental agency impacts not only the plaintiff herself, but others who are or

24  will be similarly situated, and threatens to chill the exercise of First Amendment

25  rights by a wide swath of judges and lawyers. The government's attempt to justify

26  and legitimize those practices is plainly wrong, and plaintiff has stated appropriate

27  claims for relief from such unlawful conduct. The Motion to Dismiss should be

28  denied.

# I.

## <u>THE FEDERAL COURTS HAVE REJECTED ATTEMPTS TO DISQUALIFY JUDGES BASED UPON SIMILAR GROUNDS. A FEDERAL AGENCY SHOULD NOT ACCOMPLISH BY EXECUTIVE FIAT WHAT THE COURTS HAVE UNIFORMLY PROHIBITED.</u>

The Court should heed the rationale of a long line of precedent in rejecting defendants' attempt to impose the blanket recusal order at issue here. Over the years, litigants have tried and failed to recuse federal judges from presiding over cases involving issues relevant to a certain ethnic or affinity group, based upon the judge's membership in that group. [2]

These cases hold not only that a judge's mere inclusion within a particular ethnic or religious group does not disqualify that judge from ruling on issues of interest to that group, but also that a judge's background, community involvement, etc. are also not *per se* disqualifying factors. *Commonwealth of Pennsylvania v. Local Union 542*, 388 F. Supp. 155 (E.D. Pennsylvania 1974); *United States v. Alabama* 828 F. 2d 1532 (11th Cir. 1987); *United States v. Nelson*, 2010 U.S. Dist. *Lexis* 63814 (E.D.N.Y. 2010)  The fact that a judge while in prior practice handled civil rights cases does not disqualify that judge from presiding over civil rights cases upon taking the bench.  *Paschall v. Mayone*, 454 F. Supp. 1289 (S.D.N.Y. 1978); *Blank v. Sullivan & Cromwell,* 48 F. Supp. 1 (S.D.N.Y. 1975).

Numerous cases are in accord.  *See, e.g., Feminist Women's Health Center v. Codispoti,* 69 F. 3d 399 (9th Cir. 1995) (Catholic Judge); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F. 3d 648 (10th Cir. 2002) (Episcopalian Judge); *Menorah v. Illinois High School Association*, 527 F. Supp.

---

[2] Defendants rely on 5 C.F.R. §2635.502(a) to recuse Plaintiff for an appearance of partiality.  The standard for recusal of a district court judge is governed by 28 U.S.C. §§144 and 455.  While there are wording differences between those two schemes, the standards are substantially similar, and cases relating to district judges are instructive in this context. In addition, the United States Constitution applies equally in both situations.

1   632 (N.D. Illinois 1981) (Jewish Judge); *Commonwealth of Pennsylvania v. Local*

2   *Union* 542, *supra* (African American Female Judge); *Blank v. Sullivan &*

3   *Cromwell*, *supra* (African American Judge); *Paschall v. Mayone*, *supra* (African

4   American Judge); *Perry v. Schwarzenegger*, 790 F. Supp. 2d 1119 (N.D. California

5   2011) (Gay Judge), affirmed, 671 F.3d 1052 (9th Cir. 2012), vacated on other

6   grounds, *Hollingsworth v. Perry*, __ U.S. __, 133 S.Ct. 2652, 186 L.Ed.2d 768

7   (2013); *United States v. El-Gabrowny*, 844 F. Supp. 955 (S.D.N.Y. 1994) (Jewish

8   Judge); *Idaho v. Freeman,* 507 F. Supp. 706 (D. Idaho 1981) (Mormon Judge);

9   *United States v. Nelson*, *supra* (Jewish Judge); *MacDraw, Inc. v. CIT Group*, 138 F.

10  3d 33 (2d Cir. 1998) (Asian-American Judge. Imposition of sanctions for frivolous

11  recusal motion upheld); *In re Evans*, 801 F. 2d 703 (4th Cir. 1986) (Jewish

12  Magistrate. Sanctions upheld); *United States v. Alabama*, *supra* (African-American

13  Judge); *Singer v. Talbot,* 745 F. 2d 606 (10th Cir. 1984) (Mormon Judge);

14  *Vietnamese Fisherman's Association v. Knight of the Ku Klux Klan*, 518 F. Supp.

15  1017 (S.D. Texas 1981) (African-American Judge).

16          Even where the grounds asserted to disqualify the judge are based

17  upon public remarks made by the judge, and not merely the judge's membership in

18  a particular ethnic group, the courts have rejected those efforts, as well. For

19  example, in *Commonwealth of Pennsylvania v. Local Union* 542, *supra*, the judge

20  presiding over a civil rights case refused to disqualify himself where the asserted

21  grounds for recusal were based upon public remarks made by the judge to an

22  organization said to be "a group composed of black historians" and the judge's

23  prominence in the black community. Accord: *United States v. Alabama, supra;*

24  *United States v. Nelson, supra.*

25          Here, the asserted grounds for disqualifying the plaintiff from

26  presiding over cases involving Iranian nationals did not even relate to specific

27  remarks that were made by the plaintiff or the content of any of her speeches, but

28  rather the mere fact that the plaintiff was invited to speak to various organizations

1   prominent in the Iranian-American community, and the allegation that she was "a

2   prominent advocate for the Iranian-American community" (whatever that means).

3   While the Department of Justice encourages community involvement by

4   immigration judges (Amended Complaint at ¶8), the basis for the recusal order was

5   that the community involvement on the part of the plaintiff was with regard to a

6   particular ethnic community.  That is what is particularly disturbing here.

7        Here, we have the spectacle of the United States government doing

8   what private litigants are prohibited from doing.  This only serves to put the federal

9   agency stamp of approval on conduct that the federal courts do not allow.  The

10  language in *United States v. Nelson, supra,* is particularly apt here:

11               "If Congress had enacted a statute disqualifying judges

12               from sitting on certain cases because of their religious

13               beliefs or because one of their co-religionists had some

14               involvement or interest in the outcome of the case, there

15               is no doubt that such a statute would be struck down.

16               The defendant's effort to invoke an act of Congress to

17               achieve such a result is equally unacceptable."  2010 U.S.

18               Dist. LEXIS at 63814*7.

19                                      **II.**

20      **THE GOVERNMENT'S CONDUCT IN THIS CASE ADVERSELY**

21      **AFFECTS JUDGES FROM PARTICULAR ETHNIC AND RELIGIOUS**

22      **GROUPS AND JUDGES FROM OTHER AFFINITY GROUPS, AS WELL**

23               **AS THOSE ASPIRING TO BECOME JUDGES.**

24        Of course, judges have First Amendment rights just like anybody else.

25  *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed.

26  2d 694 (2002).  For the government to take adverse action against an immigration

27  judge for exercising those constitutionally protected rights is troubling in itself.

28  However, what is particularly egregious here is the use by a federal agency of an

1    immigration judge's involvement and speaking engagements in her own ethnic

2    community to conclusively presume bias (or at least an appearance of bias) with

3    regard to any litigant who may be of the same ethnic lineage.  The ramifications of

4    that policy are widespread and of great concern.

5            It is self-evident that such a policy would only impact members of

6    ethnic or religious groups or other affinity groups.  Members of the bar, as well as

7    the judiciary, are with great frequency members of, and active in, various

8    organizations oriented to those groups.  In Southern California alone, we have bar

9    associations oriented toward African Americans, Hispanic Americans, Irish

10   Americans, Italian Americans, Asian Americans, Iranian Americans, Korean

11   Americans, Japanese Americans, Lesbian and Gay Lawyers, Chinese Americans,

12   Women Lawyers, Mexican Americans, Armenian Americans, Surfing Lawyers

13   (true), Croatian Americans, Eastern Europeans, Arab Americans, Philippine

14   Americans, Vietnamese Americans, and numerous others.

15           Those organizations are largely composed of members of those

16   particular ethnic or affinity groups, including both attorneys and judges.  Indeed,

17   some of the more prominent members of those groups are the ones who go on to

18   become judges. See *Murray v. Scott*, 253 F. 3d 1308, 1313, n.6 (11th Cir. 2001).

19   ("We have previously recognized that 'an inescapable part of our system of

20   government [is] that judges are drawn primarily from lawyers who have

21   participated in public and political affairs.' " [citation].)  Accord: *United States v.*

22   *Alabama, supra,* 828 F. 2d at 1543.  *See also, Home Placement Service v.*

23   *Providence Journal Co.*, 739 F. 2d 671, 675 (1st Cir. 1984):  "It is common

24   knowledge, or at least public knowledge, that the first step to the federal bench for

25   most judges is either a history of active partisan politics or strong political

26   connections or, as in the case of Judge Selya, both."

27           If involvement or prominence in those groups were to become a

28   disqualifying factor any time a particular judge was faced with a litigant of similar

background, the party opposing that litigant would have essential veto power over that judge and an invitation to forum shopping.  As a consequence, those aspiring to become judges someday would be less attractive candidates for that office, if they were unable to preside over cases involving parties in that ethnic group.  The tendency then would be for the more prominent members of that group to become less involved, for fear that they would be less attractive candidates as judges, or would encounter difficulties once appointed to the bench, as is the case here.  The chilling effect on expressive and associational rights is evident.

And if left unchecked, this practice could affect not only immigration judges, but innumerable other federal administrative judges, as well.  The federal system provides for a wide variety of administrative judges, for example, the United States Tax Court, Bankruptcy Court, Patent Trial and Appeal Board, Trademark Trial and Appeal Board, International Trade Commission, Federal Energy Regulatory Commission, and Social Security Administration.  A number of these agencies could also be affected.  For example, a case before the International Trade Commission involving contested imports from a particular country could not be presided over by a judge who was active in the local community of that country's expatriates.

The net effect of all of this would be a less prominent and less diverse bench.  The principles which the government is advancing are harmful to the ethnic communities, and harmful to the integrity of the federal administrative courts.  This policy should not be allowed to spread.

## III.

## PLAINTIFF HAS ALLEGED AN ADVERSE EMPLOYMENT ACTION.

The government argues that the actions taken against the plaintiff as alleged in the First Amended Complaint do not constitute an adverse employment action.  In fact, there is no question that it does.

The clear appearance created by the government's actions is that the

1  plaintiff has been accused – by the government itself – of bias or the appearance of

2  bias in favor of Iranians.  This strikes directly at the plaintiff's qualifications to

3  serve as a judge.  As recognized by the Court in *MacDraw, Inc. v. CIT Group,*

4  *supra*:

5  　　　　　"A suggestion that a judge cannot administer the

6  　　　　　law fairly because of the judge's racial and ethnic

7  　　　　　heritage is extremely serious and should not be

8  　　　　　made without a factual foundation going well

9  　　　　　beyond the judge's membership in a particular

10  　　　　　racial or ethnic group.  Such an accusation is a

11  　　　　　charge that the judge is racially or ethnically

12  　　　　　biased and is violating the judge's oath of office."

13  　　　　　138 F. 3d at 37 (Emphasis added.);

14  　　　　　Accord: *United States v. Nelson, supra,* 2010 U.S.

15  　　　　　Dist. LEXIS 63814 at*10.

16  　　　　　Such an attack on the fitness of the plaintiff to serve as a judge is

17  undoubtedly an adverse employment action.  The government's refusal to rescind

18  its order, and its tenacious defense of that order, only serve to magnify its

19  significance.

20  　　　　　And the effect of the government's action may not stop there.  If the

21  plaintiff has been pronounced by the government to be biased in favor of Iranians,

22  this could lead to accusations of bias against her by immigration applicants from

23  other countries who may have an historical or current adversity to Iran (*e.g.* Israelis,

24  Iraqis).  This could lead to further recusal requests by the applicants themselves,

25  further impairing the plaintiff's ability to do her job.

26  　　　　　In its Motion to Dismiss, the government claims that this is a minor

27  matter, and that the plaintiff has only had to disqualify herself from eight cases.

28  This argument is misleading at best.  To begin with, any amount of discrimination

1   is unlawful.  But more importantly, the argument overlooks the fact that this

2   situation is ongoing and has been in place for going on three years.  Under the

3   government's order, no cases involving Iranians are being assigned to the plaintiff.

4   Amended Complaint at ¶ 44.  The government's reference to the eight cases does

5   not take into account the undetermined number of cases involving Iranian

6   applicants that were never assigned to the plaintiff in the first place.  And as time

7   goes on, the situation will only worsen.

8                                    **CONCLUSION**

9            The actions of the government as alleged in the Amended Complaint

10  cannot stand.  Those actions threaten to undermine years of efforts to diversify the

11  bench, by applying rules to judges of ethnic backgrounds that are not applicable to

12  other judges.  If the government truly believes that it can justify such a policy, it is

13  free to attempt to do so in this action.  But the Amended Complaint states

14  cognizable claims for relief, including injunctive relief, and Plaintiff is entitled to

15  have those claims heard.  The Motion to Dismiss should be denied.

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:    February    , 2015           RESPECTFULLY SUBMITTED,

2                                          MANATT, PHELPS & PHILLIPS, LLP

3
                                           By:  /s/ Carl Grumer
4                                               Carl L. Grumer
                                                Attorneys for *Amici Curiae* Arab
5                                               American Lawyers Association of
                                                Southern California, Asian Americans
6                                               Advancing Justice, Asian Pacific
                                                American Bar Association of Los
7                                               Angeles County, Asian Pacific
                                                American Women Lawyers Alliance,
8                                               The Iranian American Bar
                                                Association, Korean American Bar
9                                               Association of Southern California,
                                                Mexican American Bar Association
10                                              of Los Angeles County, National
                                                Asian Pacific American Bar
11                                              Association, Philippine American Bar
                                                Association, South Asian Bar
12                                              Association of Northern California,
                                                South Asian Bar Association of
13                                              Southern California, Southern
                                                California Chinese Lawyers
14                                              Association, and Thai American Bar
                                                Association
15

16   313817937.3

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX 1**

**Arab American Lawyers Association Of Southern California**

The Arab American Lawyers Association of Southern California ("AALASC") is the bar organization for Southern California legal professionals interested in Arab American Civil Rights and Culture. Formed three decades ago, AALASC firmly supports the independence of the judiciary, the right of lawyers to practice their profession without interference, and the protection of human rights. This issue at the heart of Tabaddor v. Holder et al. is of a vital importance to AALASC as it directly concerns the legal profession and could discourage lawyers of diverse backgrounds from seeking judicial or administrative offices. Consistent with its mission and purpose, AALASC respectfully submits its Statement of Interest in support of the Brief filed by Amicus Curiae Asian Americans Advancing Justice in the matter of Tabaddor v. Holder et. al., Case No.14-cv 06309 GW.

**Asian Americans Advancing Justice**

Asian Americans Advancing Justice ("Advancing Justice") is a national affiliation of five independent nonprofit, nonpartisan organizations: Asian Americans Advancing Justice | AAJC (formerly known as Asian American Justice Center) from Washington, D.C., Asian Americans Advancing Justice | Asian Law Caucus (formerly known as Asian Law Caucus) from San Francisco, Asian Americans Advancing Justice | Chicago (formerly known as Asian American Institute), Asian Americans Advancing Justice | Los Angeles (formerly known as Asian Pacific American Legal Center) ("AAAJ-LA"), and Asian Americans Advancing Justice | Atlanta (formerly known as Asian American Legal Advocacy Center). Through litigation, direct legal services, policy advocacy, community outreach and education, and organizing, Advancing Justice seeks to promote a fair and equitable society for all by working for civil and human rights and empowering

1   Asian Americans and Pacific Islanders and other underserved communities.

2   Members of Advancing Justice believe that our public and private institutions

3   should be free of discrimination and reflect the racial and ethnic diversity in our

4   larger society, and we support efforts to ensure these goals, including in the judicial

5   system.  AAAJ-LA represented the Plaintiff briefly in connection with this matter

6   prior to the filing of this action, but joins in this brief in its capacity as set forth

7   above.

8

9   **Asian Pacific American Bar Association Of Los Angeles County**

10          The Asian Pacific American Bar Association of Los Angeles County

11   ("APABA-LA") is a membership organization comprised of over 700 attorneys,

12   judges and law students. Since its formation in 1998, APABA-LA has advocated on

13   issues that impact the APA community and has demonstrated a commitment to civil

14   rights, racial justice, and equal opportunity. APABA-LA has, and continues to,

15   oppose actions designed to deprive immigrants, people of color, and other

16   minorities of their civil rights, including orders that discriminate on the basis of

17   race and national origin or which may discourage potential judicial candidates of

18   diverse backgrounds from seeking appointment and being active in their respective

19   communities. APABA-LA strives to advance diversity in the legal profession and

20   believes that active participation and commitment to one's cultural and ethnic

21   communities is conduct that should be encouraged, not curtailed.

22

23   **Asian Pacific American Women Lawyers Alliance**

24          Asian Pacific American Women Lawyers Alliance ("APAWLA") is an

25   organization that promotes inclusion, empowerment and advancement of Asian

26   Pacific American women in the legal profession.  APAWLA's members include

27   lawyers, judges, and law students throughout California, who work in solo

28   practices, law firms, state and federal courts; are prosecutors, defenders and civil

1   practitioners; and work for non-profits and government agencies.  APAWLA

2   members share a common goal of protecting and promoting the rights of

3   individuals and communities that have traditionally been underrepresented and

4   marginalized.  To that end, APAWLA supports efforts to broaden the racial, ethnic,

5   gender and sexual orientation diversity of the legal profession, and in particular, the

6   judiciary.  APAWLA joins this amicus brief because it opposes any discriminatory

7   efforts that limit and discourage diversity in the legal profession.

8

9   **The Iranian American Bar Association**

10       The Iranian American Bar Association ("IABA") is a is a nonprofit

11   corporation consisting of hundreds of attorneys, judges and law students

12   nationwide. IABA seeks to inform the Iranian-American community about legal

13   issues of interest, and to advance those interests.  IABA has an express goal and

14   demonstrated history of commitment to diversity, civil rights, and equal

15   opportunity, and opposes any discriminatory actions that deprive individuals of

16   their rights and privileges based on classifications such as race and national origin.

17   Consistent with its goal, IABA believes that diversity only serves to enhance the

18   legal profession and it thus committed to a diverse and independent judicial bench.

19   IABA opposes any policies or actions that threaten the diversity or independence of

20   the judicial bench, especially on the basis of members' commitment to or

21   participation in their ethnic or cultural heritage.

22

23   **Korean American Bar Association Of Southern California**

24       The Korean American Bar Association of Southern California ("KABA") is a

25   nonprofit corporation organized under the laws of the State of California that is

26   comprised of licensed attorneys and law students dedicated to advocating civil

27   rights, providing legal services and education, and building coalitions to positively

28   influence, impact and advance the interests of Korean Americans, people of Korean

1  descent and the communities in which they work, reside and visit.   Since its

2  founding in 1980, KABA has worked towards achieving an integrated, equitable,

3  harmonious and just society.  Such efforts have been directed towards creating a

4  racially diversified and balanced judicial bench in Southern California through

5  means such as the endorsements of candidates and garnering support for the judges

6  appointed and elected to their positions.

7

8  **Mexican American Bar Association Of Los Angeles County**

9        The Mexican American Bar Association of Los Angeles County ("MABA")

10  is a voluntary California bar association whose members include attorneys, judges,

11  elected officials, law school students and business people of Latina/o and other

12  ethnic backgrounds. MABA's members have a vested interest in seeing that no

13  policy is implemented that would threaten the careers of present, future, and

14  aspiring judges who are members of any affinity group, whether racial, ethnic,

15  religious, or otherwise.  Many MABA members are immigration attorneys or

16  judges, and MABA works to strive to see more Latino attorneys and judges on the

17  bench, including immigration attorneys and immigration judges. Because MABA

18  represents a significant number of Latina/o immigration attorney and judge

19  members, including, perhaps, some that may have been foreign-born and have a

20  similar experience to that of Judge Tabaddor, MABA offers a unique perspective on

21  the harms resulting from a policy requiring de facto recusal of a foreign born judge

22  based upon ethnicity of a party appearing before her.  MABA has been in existence

23  since the late 1950's and is the largest Latina/o voluntary local bar association in the

24  State of California. For decades, it has represented the interests of the Latina/o

25  community, promoted the administration of justice, and maintained the honor and

26  dignity of the legal profession. MABA filed an amicus brief in support of admitting

27  Sergio C. Garcia to the State Bar of California, and argued that the State's interests

28  are best served by an attorney admissions policy that does not exclude applicants on

1   the basis of immigration status.  MABA is committed to the advancement of the

2   legal profession, including the rights of immigrant judges, attorneys, and the

3   community, whether Latina/o or non-Latina/o.

4   **National Asian Pacific American Bar Association**

5         The National Asian Pacific American Bar Association ("NAPABA") is the

6   national association of Asian Pacific American attorneys, judges, law professors,

7   and law students, representing the interests of over 40,000 attorneys and more than

8   70 national, state, and local Asian Pacific American bar associations, who work

9   variously in solo practices, large firms, corporations, legal services organizations,

10  non-profit organizations, law schools, and government agencies. Since its inception

11  in 1988, NAPABA has served as the national voice for Asian Pacific Americans in

12  the legal profession and has promoted justice, equity, and opportunity for Asian

13  Pacific Americans and people of color. One of the core tenets of NAPABA's

14  mission is to promote diversity and inclusion in all aspects of the legal profession,

15  including the judiciary.  NAPABA joins this amicus brief because of the larger

16  policy issues implicated in Judge Tabaddor 's case, and the possible unfair chilling

17  effect blanket recusal orders given to judges with certain backgrounds or interests

18  might have on communities of color and the bench generally.

19

20  **Philippine American Bar Association**

21        The Philippine American Bar Association ("PABA") is an organization

22  comprised of judges, lawyers, public servants, and law students in Southern

23  California.  PABA, one of the largest Filipino American bar associations in the

24  country, was formed in response to the legal issues confronting the Filipino-

25  American community and the professional concerns of Filipino-American lawyers

26  and students seeking to enter our profession.  As part of its mission, PABA strives

27  to be a leading advocate on matters affecting Filipino-Americans and to increase

28  Filipino-American participation and representation in the legal profession.

**South Asian Bar Association Of Northern California**

The South Asian Bar Association of Northern California ("SABA-NC") was founded in 1993 to, inter alia, advocate for the South Asian community and support those who value diversity in the legal profession.  SABA-NC opposes discriminatory treatment of attorneys, judicial officers, and individuals appearing before our judicial system on the basis of their race, national origin, or religion.

**South Asian Bar Association Of Southern California**

The South Asian Bar Association of Southern California ("SABA-SC") is one of the oldest and largest South Asian bar associations in the country. It is dedicated to the advancement and development of South Asian attorneys as well as attorneys interested in issues affecting the South Asian community. As part of its mission, SABA actively supports the fair treatment of all individuals and has participated in programs and made other efforts to encourage diverse viewpoints and opposes discriminatory treatment of members of the bar, judiciary and judicial candidates on the basis of race, national origin, religion, sex or gender, among others.

**Southern California Chinese Lawyers Association**

Formed in 1975, the Southern California Chinese Lawyers Association ("SCCLA") is one of the oldest Asian Pacific American ("APA") bar associations in the United States. By promoting the interests and opportunities of APA and other ethnic minority legal professionals, SCCLA has developed a vast membership base of lawyers, judges, law students, and elected and appointed officials. Since its inception, SCCLA has supported racial equality, civil rights, justice, and access to justice, especially for the low-income and immigrant communities. SCCLA believes that diversity on the bench is a key component to achieving justice for

1  underprivileged communities. SCCLA opposes discrimination based upon race,
2  national origin, gender, and gender preference. Governmental orders based upon
3  race, national origin, or interaction with certain minority groups will discourage
4  diverse legal professionals from seeking appointment to the bench.

5  **Thai American Bar Association**

6      The Thai American Bar Association ("TABA") is a membership organization
7  established in late 2012 to reflect the interests and needs of the Thai and Thai-
8  American community in Southern California. TABA's objectives include
9  coordinating services to the greater Thai community (including immigration
10  services), fostering relationships with other legal organizations and the legal
11  community at large, and facilitating the professional development of the
12  association's members. TABA opposes initiatives designed to deprive minorities of
13  their civil and constitutional rights, including initiatives that discriminate based
14  upon ethnicity and curtail an individual's exercise of their First Amendment rights,
15  and supports initiatives that encourage diversity and community engagement in the
16  legal profession.

22  314055316.1